CHELSEA ASSOCIATES, a Tennessee
partnership, Plaintiff,

v.

John A. RAPANOS et al., Defendants.

Civ. A. No. 34565.

United States District Court,
E. D. Michigan, S. D.

May 10, 1974.

Robert A. Fineman, of Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for plaintiff.

Richard D. Rohr, of Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JOINER, District Judge.

Plaintiff, Chelsea Associates, has instituted this action charging each of the named defendants with violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 (17 C.F.R. 240.10b-5), promulgated thereunder by the Commission.[1]

In simplest terms, this action arises out of the sale by the named defendants of a certain amount of stock in Aseco, Inc. (hereinafter referred to as "Aseco"), a Michigan corporation, to the plaintiff on October 4, 1968.[2] On that date the plaintiff paid a total price of $44.00 per share for 47,727 shares of stock, or an aggregate purchase price of approximately $2,099,998. By March, 1970, stock in Aseco was worth no more than $1.00 a share.

The plaintiff seeks rescission of the purchase price or, in the alternative, damages in the sum of $2,052,271, which plaintiff alleges represents the difference between the current value of the stock and the price paid for the stock on October 4, 1968.

All parties waived a trial by jury. As a result of the lengthy trial on both issues of liability and damages, and the numerous documents, briefs and arguments submitted by counsel, the court makes the following

[1]. 17 C.F.R. § 240.10b-5, promulgated pursuant to § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides: "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or,
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security."
The plaintiff also alleged defendants' violation of the Michigan Uniform Securities Act, M.C.L.A. § 451.501 et seq.; M.S.A. § 19.776 (101) et seq. Since the language of M.C.L.A. § 451.501, M.S.A. § 19.776(101) is substantially similar to the language of Rule 10b-5, the plaintiff's only thrust throughout the trial was directed at the violation of federal law.
In addition, the complaint alleged certain violations of the Michigan Uniform Securities Act registration provisions, as to which no proofs were offered at trial. This placitum, therefore, will not deal with any alleged state law violations of the registration provisions.

[2]. Defendants' individual stock holdings of Aseco, Inc., at the time of sale were as follows:

| | |
|---|---|
| John A. Rapanos | 35,715 |
| Nicholas A. Rapanos (brother) | 27,465 |
| Judith Ann Rapanos (wife) as Custodian for: | |
| Matthew Rapanos | 1,950* |
| Mark Rapanos | 1,950 |
| Michael Rapanos | 1,950 |
| Nicoletta Rapanos (mother) | 300 |
| Edward and Irene Nelkie (father-in-law and mother-in-law) | 300 |
| Total | 69,630 |

* This figure does not include 400 shares still held for two of the Rapanos children.
At the time of purchase, plaintiff was part of a buying group organized to purchase 75,262 shares of stock in Aseco, Inc. Out of this total acquisition, of which defendants' 69,630 shares were a part, plaintiff purchased 47,727 shares.

## Findings of Fact

### The Parties

Plaintiff, Chelsea Associates (hereinafter referred to as "Chelsea") is a partnership organized under the laws of the State of Tennessee. Chelsea was formed only for the purpose of making the purchase of stock that is the subject of this action. The members of the Chelsea group were Messrs. Henry W. Hooker, Albert E. Hill, Jack M. Bass, John R. Ozier and John J. Hooker, Jr., each of whom is a resident of Tennessee.

The defendants are John A. Rapanos (hereinafter referred to as "Rapanos"), his brother, Nicholas A. Rapanos, his wife, Judith Ann Rapanos, as Custodian for Michael John Rapanos, Mark Edward Rapanos and Matthew Alex Rapanos, his mother, Nicoletta Rapanos, and his in-laws Edward J. Nelkie and Irene M. Nelkie. Each of the defendants is a resident of the State of Michigan.

It is conceded by all parties that defendant John A. Rapanos is the target defendant in this case. At the time of the transaction which gave rise to this suit, Rapanos had been Chairman of the Board and Chief Executive Officer of Aseco since September, 1967, and was the controlling shareholder in Aseco.

Two other people, not parties, but participants in the occurrences which gave rise to this action, merit brief mention.

Mr. Hugh Pike (hereinafter referred to as "Pike") was, at all times pertinent to this action, a Vice President and Sales Manager for Hinton-Jones & Co., Inc., a brokerage house based in Seattle, Washington. Pike was an intimate confidant and representative of the plaintiff buying group.

Mr. Jack deKruif (hereinafter referred to as "deKruif") was President, Director and Chief Operating Officer of Aseco from 1966 until his severance from the corporation on January 15, 1969. Mr. deKruif, in either late August or early September, 1968, agreed to become a member of the acquisition group being organized by Henry W. Hooker to acquire the Rapanos family's share of Aseco. Although he intended to be a member of the buying group, he announced to Messrs. Pike and Hill at the closing of the transaction on October 4, 1968, that he could not be a member because of his recent divorce property settlement.

### History and Operations of Aseco

Aseco is a Michigan corporation organized in 1962, the stock of which was, at all pertinent times, traded publicly in the over-the-counter market. Its various operations were as follows:

*Chelsea Plant:* One of Aseco's plants, located in Chelsea, Michigan, was principally involved in assembling and welding components of bodies for International Harvester Corporation, the bodies being identified as the Travelall (hereinafter referred to as the "C-line") and the Travelette and Travelcrew.

*Rose City Plant:* Another Aseco plant, located in Rose City, Michigan, was engaged in the production of the M-149 and M-625 portable water trailer for the United States Army.

*Holland Plant:* Still another Aseco plant, located in Holland, Michigan, was engaged in the production of the M-101 utility trailer for the United States Army.

*Deco Corporation:* This subsidiary, located in Warren, Michigan, and engaged in precision horizontal jig boring and milling operations, was acquired August 26, 1968, by Aseco for $1,800,000. This purchase was financed by borrowing the entire purchase price from the Michigan National Bank in the form of a ninety (90) day note.

Aseco's operations consisted of what are called in the industry "job shops", or businesses which operated, and relied for their continued operation, on specific contracts for a specified number of units. Aseco did not have any proprietory products and, apart from the acquired Deco Corporation, was primarily dependent upon two sources for continued business, International Harvester Corporation and the United States Government.

While under the leadership and control of Rapanos and his management group, Aseco received constant leadership and sales effort in an attempt to build Aseco into a sustained and profitable enterprise. Despite the efforts by Rapanos and his group the sales and earnings of Aseco, reflecting the volatile nature of a job shop business, were erratic.[3]

In the May 20, 1968, Annual Report, and June 14, 1968, Report to Shareholders, Aseco stated it had a backlog of firm business of $17,000,000 for fiscal 1969.

Plaintiff has contended that the defendants violated Section 10b and Rule 10b–5 by failing to disclose, prior to October 4, 1968, the following information:

A. The negative working capital position of Aseco which was created as a result of the acquisition of Deco Corporation on August 26, 1968.

B. The loss of the "C-Line" business of International Harvester Corporation at the Chelsea plant, and

C. The status of Aseco's government contract work, specifically, Aseco's bid status on the M–149 government contract.

*The Negative Working Capital Position of Aseco.*

Prior to the Deco acquisition, Aseco obtained an appraisal from Samuel L. Winternitz & Company which reported that Deco's machinery and equipment, carried on its books at July 31, 1968 at $796,576 had an auction value of $958,405, and that Deco's real estate and building, carried on its books at July 31, 1968 at $278,318 had an auction value of $403,400. This appraisal was made at the request of Michigan National Bank.

In addition to its fixed assets, Deco at July 31, 1968 had current assets of $503,966 and debt of only $16,568.

Deco had a long history of profitable operations. Net earnings for its fiscal years ending January 31 of 1966, 1967 and 1968 were $128,308, $228,723 and $210,989 respectively. Such earnings were after its owner's salary, which was in excess of $100,000 for 1968, was deducted.

Aseco bought Deco to operate, not to liquidate, and Deco's list of numerous civilian customers provided Aseco with diversification of business since no single customer of Deco accounted for more than 12% of sales.

Frank J. McCabe, Senior Vice President of the Michigan National Bank, was also a Director of Aseco. McCabe approved the acquisition of Deco and its financing, both for the Bank and as a Director of Aseco. The Bank increased Aseco's existing line of credit from $2,000,000 to $2,500,000 to permit the $1,800,000 borrowing and to facilitate a speedy closing and at the same time agreed to provide long term financing.

---

3. Aseco's sales and earnings were historically erratic as evidenced by the following publicly reported figures:

| Fiscal Year Ending February 28/29 | Sales | Earnings |
|---|---|---|
| 1965 | $ 585,774 | $ 14,716 |
| 1966 | 3,219,715 | 89,134 |
| 1967 | 9,606,743 | 334,183 |
| 1968 | 8,181,157 | 140,575 |
| First Quarter Ending May 31, 1968 (Unaudited) | 4,472,472 | 222,666 |

At the end of fiscal 1968, Aseco's net worth was $862,577.

Although not publicly reported by October 4, 1968, Aseco's operating results for its six months ending August 31, 1968 were:

| Sales | Earnings |
|---|---|
| $9,563,643 | $469,668 |

Although the initial financing of the Deco acquisition was done by a short-term, ninety (90) day note, it is clear from the record McCabe did not lend this money to Aseco only to foreclose a short time later. He was optimistic about Aseco's future. He felt Aseco's financial condition was satisfactory and he had confidence in Aseco's management. McCabe told the other Aseco directors, deKruif and Rapanos, that term loan financing of the Deco acquisition would be worked out. No specific amount was agreed upon prior to October 4, 1968, but Rapanos, from this discussion with McCabe, believed that at least $750,000 and possibly $1,200,000 of the original borrowing would be placed on a long term basis.

The Deco acquisition and the consideration of $1,800,000 was promptly announced to the public. A telegram announcement was sent to Hinton-Jones & Co., Inc. Pike discussed the acquisition of Deco in a telephone conference call with deKruif and advised Hooker of this discussion, including advice that the acquisition was for cash.

This negative working capital position was openly discussed at the Aseco Board of Directors meeting on October 4, 1968, the same day as the closing, and was communicated to Hill in October with the Aseco financial material.

At no time prior to or on October 4, 1968, did Pike, or any member of the plaintiff buying group express concern about the negative working capital position of Aseco.

*Loss of the C-Line business at the Chelsea Plant.*

Prior to October 4, 1968, the Chelsea plant was a metal-working job shop producing a variety of metal body panels and smaller metal body parts for International Harvester Corporation. In addition, this plant was producing some parts for Ford Motor Company and some components for Aseco's Rose City and Holland plants. The record contains only estimates of what portion of Chelsea production involved the C-Line. De-

Kruif estimated the C-Line was possibly 70–90% of Chelsea production. Rapanos estimated the Chelsea production was 80% for International Harvester Corporation and that the C-Line was a substantial part of this 80%.

The entire International Harvester business constituted approximately 16% of Aseco's operations.

In 1967, International Harvester Corporation advised Aseco that it planned to produce the C-Line portion of its business in-house, beginning in late 1968.

In 1967, all of the management group under Rapanos had knowledge that this portion of the International Harvester business would be lost sometime in late 1968. DeKruif's report to the directors of Aseco in December, 1967, indicated that the C-Line program would end in October, 1968, but his report of March 20, 1968, showed sales of the C-Line by Chelsea through November, 1968.

There is no evidence that the loss of the C-Line meant the loss of all International Harvester Corporation business. Aseco's Chelsea plant had satisfactorily supplied International Harvester for nearly twenty (20) years, through many model changes, and Aseco had been assured that Harvester would make every effort to replace the C-Line with other work.

In addition to maintaining a viable business liaison with International Harvester Corporation, Aseco sought replacement business for the Chelsea plant. Attempts were made to secure contracts from the major auto industries and to successfully bid contracts for work which could be performed in the Chelsea plant with minor plant alterations.

After examining the testimony of the witnesses questioned about the discussion of the International Harvester Corporation at the June 7, 1968 shareholders' meeting (attended by fifty [50] to sixty [60] people), and after weighing the credibility and bias of each, the court finds that the shareholders were advised

that International Harvester Corporation was taking a significant portion of the then existing International Harvester Corporation business into their own plant in the fall of 1968.

The court further finds that Pike was present during the entire stockholders' meeting on June 7, 1968.

*Aseco's Loss of the M–149 Government Contract.*

Prior to October 4, 1968, Aseco was performing work under contracts with the military at its Rose City and Holland plants. The Rose City facility was equipped to produce the M–149 portable water trailer for the United States Army.

The M–149 government contracts were approximately 30–40% of Aseco's total sales in the past.

Aseco had been the only company to ever successfully build the M–149. The management group under Rapanos considered this to be a significant fact and announced it as such to the shareholders of Aseco.

In November, 1968, the Rose City plant would have completed its third M–149 government contract. During January, 1968, while working under the existing contract, Aseco bid on another contract for the production of M–149 trailers to be produced at the Rose City plant.

Aseco was the third low bidder on this M–149 contract, behind Aerotech Corporation, the lowest bidder, and West Coast Machinery, Inc. Aseco, however, filed protests against the award to Aerotech Corporation, alleging that Aerotech Corporation was not a qualified bidder because it was not capable of performing the contract. Aseco also obtained an option to acquire Aerotech Corporation for $5,000 and take its bidding position in the event the protest was denied.

On September 13, 1968, the government rescinded its award to Aerotech Corporation and awarded the contract to West Coast Machinery, Inc., the second low bidder and a qualified bidder, rather than placing the bid back on the street, as sought by Aseco's protest.

Rapanos and deKruif knew on September 13, 1968 that the M–149 contract was lost.

At the June 7, 1968 Aseco shareholders' meeting, deKruif had reported to the fifty (50) to sixty (60) shareholders present, including Pike, that Aseco had not been initially awarded the M–149 contract, but that protests had been filed and that past success in producing the M–149 made them reasonably confident they would ultimately secure the contract.

*Activities and Knowledge of the Buying Group Prior to October 4, 1968.*

Beginning in May, 1968, Pike became involved in efforts to either acquire control of Aseco through purchase of the Rapanos shares or to work out the merger of Aseco with another company.

He made offers to purchase Rapanos's shares in May and June, 1968.

He worked with Allied Equities, Inc., to initiate merger discussions in June, 1968.

He worked with the Western Pacific Corporation on a possible merger in June and July, 1968.

He prepared figures as to Aseco's four year results and a projection of future earnings.

There is evidence that Pike had information which would have been available only to an insider. In May of 1968, he had a preliminary copy of a June shareholder meeting proxy. He acquired certain information concerning Aseco's profit potential during the summer of 1968. Pike also had balance sheet figures not available to the public. There is no evidence, however, that any of this information came from the defendants. It appears to the court that this information came from sources over whom the defendants had no control.

Pike knew the International Harvester business was terminable on short notice.

In late August, 1968, Pike met Hooker and began to work with Hooker and Hill

to explore the acquisition of Aseco by Whale Electronics, Inc. (hereinafter referred to as "Whale"), a conglomerate located in Nashville, Tennessee, and owned by Hooker, Hill and others.

Shortly thereafter, Hooker, Hill and Pike met in New York City with Bert Kleiner, an investment banker, to review the possibility of a tender offer by Whale for all Aseco shares. Mr. Kleiner reviewed the published materials for Aseco presented by Pike and strongly recommended against such an investment. His disapproval of the investment was based on the facts that: Aseco was a job shop operation without any proprietary products; it was primarily dependent on only two (2) customers; it did not have an adequate working capital position, and; anyone could get into the type of business engaged in by Aseco.

Pike arranged a meeting between Hill and deKruif, on September 9, 1968, so they could tour the Aseco Holland plant and discuss deKruif's willingness to participate in the buying group and continue to operate Aseco for the buying group. On that same day Pike, acting for Hooker, Hill and their associates, instituted a series of negotiations with Rapanos by telegram and telephone which culminated in the offer and acceptance of September 19, 1968.

All contacts betweeen the plaintiff buying group and Rapanos were handled by Pike. No member of the plaintiff buying group ever had any discussions about Aseco with Rapanos.

*Hooker and Hill*

At the time of the purchase of the Rapanos family stock, both Hooker and Hill, general partners in Chelsea Associates, were experienced businessmen with extensive experience in the acquisition of businesses. Hill, as President of Whale, had participated in numerous acquisitions for Whale, including the acquisition of companies with government contracts. Hooker, both as lawyer and as investor, had participated in numerous business acquisitions.

The investigation of Aseco's financial and operational status by Hooker and Hill, the primary participants of the plaintiff buying group, prior to October 4, 1968, was cursory at best. Neither Hooker nor Hill had any discussions with the owners of Aseco. They made no attempt to obtain crucial indicia about the financial condition or business projections of Aseco from the owners. No inquiry was made into Aseco's work backlog, major customers and contracts, or even the future of the products produced by Aseco. Neither Hooker nor Hill inspected Aseco's physical facilities, except for Hill's brief tour of the Holland plant. Instead, Hooker, Hill and the other members of the buying group relied almost entirely on the representations and projections about Aseco made to them by Pike.

*The Pike Projections*

The representations and projections about Aseco's financial condition and future, prepared by Pike, were derived from Aseco's 1968 Annual Report To Shareholders, the first quarter earnings and operations statement for the three months ending on May 31, 1968, and spread sheets prepared by Pike from published Dun & Bradstreet reports. The prepared spread sheets reflected the Aseco balance sheets and operations statements for fiscal years 1965, 1966, 1967 and 1968, comparisons of the first quarter results for fiscal 1968 and 1969 and projections for 1970 extrapolated by Pike from the first quarter 1969 results.

The court finds that the public sources of information which formed the basis for the Pike representations and projections were correct. The court further finds, however, that the representations and projections made by Pike, based on this public information, were erroneous, contained foolish estimates of future earnings by Aseco and that only Pike was responsible for these estimates.

*Plaintiff's Control and Operation of Aseco after October 4, 1968*

From and after October 4, 1968, Hill, as Chairman of the Board of Aseco, had

complete access to all information concerning Aseco's financial condition and operations. He knew of the negative working capital position in October, 1968. He discussed the problems on the M–149 contract, which he knew was lost, with deKruif in November, 1968. He knew, by his own admission, of the loss of the International Harvester business at least by January 15, 1969.

The leadership of Aseco after the October 4, 1968 acquisition was primarily one of absentee management. Pike and Hill were elected to the Aseco Board of Directors and Hill was also elected Chairman of the Board on October 4, 1968. In addition, Hill was elected Chairman of the newly formed Executive Committee and Chairman of the Stock Option Committee and Bonus Committee on October 31, 1968.

The response by Pike and Hill to these accolades of responsibility, however, was minimal. Hill was never in contact with the physical operations of Aseco and attended only a few of the meetings of the Board of Directors of Aseco. Pike, likewise, had little contact with Aseco, choosing instead to leave the operation of Aseco almost entirely in the hands of deKruif.

Hooker had virtually no knowledge of Aseco's operations or financial condition until late April or May, 1969.

Aseco continued to build the C-Line for International Harvester into December, 1968, and produced parts for International Harvester into January, 1969. The Aseco Rose City plant completed the water trailer contract in October or November, 1968, and the Aseco Holland plant completed the cargo trailer contract in January, 1969.

After this work terminated, Aseco, under the new management group, was not able through competitive bidding to secure any new government contract business for the Rose City or Holland plants. In addition, poor management relations, under the new management group, developed between Aseco and International Harvester which effectively nullified any opportunity of obtaining new business from International Harvester.

The Deco operation lost revenue during the period of August, 1968, through February, 1969, and did not begin to operate profitably until June, 1969.

During the period of plaintiff's control of Aseco, October 4, 1968, to approximately June or July, 1969, neither Hooker, Hill nor any other member of the buying group contacted Rapanos with respect to the loss of the International Harvester business, the M–149 government contract or the negative working capital position of Aseco.

### The Aseco-Whale Merger

The principal management efforts of the plaintiff buying group subsequent to October 4, 1968, and through May, 1969, were devoted to trying to merge Aseco and Whale.

On or about November 11, 1968, Hill invited Pike and deKruif to Nashville, Tennessee, to discuss a possible merger of Aseco and Whale. The proposed merger was publicly announced on November 12, 1968, prior to any action by the Aseco Board of Directors, on the exchange basis of two shares of Whale stock for one share of Aseco stock. The Aseco Board of Directors approved the merger, in principle, on November 13, 1968.

At the Aseco Board of Directors meeting of November 13, 1968, deKruif emphasized that Aseco required additional business, and that Whale intended to maintain Aseco as a separate operating entity and would permit Aseco to expand through acquisition, using cash or Whale stock. Moreover, throughout this period of attempted merger the Aseco plant managers had been assured that Whale had enough overflow business to keep the Aseco plants busy.

During this period of attempted merger between Aseco and Whale significant change occurred in the management personnel of Aseco. DeKruif, because of the proposed merger, had decided in late

1968, to terminate his relationship with Aseco. As a result of correspondence and discussions between deKruif and Hill, deKruif resigned as President, Director and Chief Operating Officer of Aseco on January 15, 1969.

In order to replace deKruif, a subordinate officer of Aseco was elected on January 15, 1969, as interim President of Aseco, with the understanding that his term would expire when the merger became effective. DeKruif strongly urged the Board of Directors not to appoint this particular subordinate officer as interim President because he had no experience in running Aseco, no experience in obtaining new contracts, no experience with labor relations, manufacturing and production and was generally not qualified for the position as President of Aseco. DeKruif's judgment of this subordinate's capabilities was confirmed by Rapanos, who had been associated with him during the time Rapanos was with Aseco.

On or about May 22, 1969, the Aseco Board of Directors learned that Whale had, a few days earlier, unilaterally announced termination of the proposed Aseco-Whale merger.

The abortive attempt by the new Aseco management group to merge Aseco and Whale during the period of November, 1968, through May, 1969, was catastrophic to Aseco.

As a result of this merger attempt Aseco lost deKruif, a crucial figure in the management of Aseco, and gained a person as acting President who did not seem to have the capacity and competence to guide Aseco through a financially troublesome period.

The emphasis on securing business for Aseco during this period was directed at finding business at Whale which could be given to Aseco for production, instead of from independent sources in the open market. This failure to secure new business plus the public statements and reassertions of the value of Aseco stock in relation to Whale stock because of the proposed merger, and the sudden collapse of these figures in June, 1969, proved fatal to Aseco.

The mere loss of business alone is not significant since Aseco was a job shop operation and had gone through such periods on previous occasions. But when the loss of business was coupled with the collapse of the inflated value of Aseco stock (it reached almost double the value paid by the plaintiff approximately 1½ months after the proposed merger was announced), it caused a loss of public confidence in Aseco and a loss of its ability to acquire additional capital in order to continue operation.

*The Knowledge and Activity of Rapanos.*

Rapanos knew about the loss of the International Harvester business, the M-149 government contract and the negative working capital position of Aseco prior to October 4, 1968.

Rapanos knew of Pike's interest in getting control of Aseco and knew of the steady purchases of Aseco stock by Hinton-Jones for the west coast shareholders until the holdings of that group by the end of May, 1968, were approximately as large as the Rapanos family. He had reviewed subsequent monthly transfer sheet and these showed additional transfers to the west coast in June, July and August, 1968, which indicated that west coast shareholders may have more shares than the Rapanos family holdings, and might have 30-40% of the outstanding Aseco stock. He did not wish to be in a business he could not control.

Rapanos had learned of the termination of the C-Line business of International Harvester in 1967, but repeatedly refused Pike's offer to purchase during the months of May through August, 1968.

Rapanos did not initiate any efforts to sell his stock. Instead, he rejected a number of offers by Pike to buy him out. However, Rapanos decided to sell his stock and his family's stock in Aseco on September 13, 1968, and accepted Pike's offer to buy when he learned the M-149 government contract had been

awarded to West Coast Machinery Corporation.

*Aseco's Stock Valuation*

Plaintiff purchased 47,727 shares of Aseco stock from the defendants for a price of $42.66 a share, which together with commissions brought the price paid by plaintiff to $44.00 a share, or an aggregate purchase price of $2,099,998.

During the period October 4, 1968 through June, 1969, Aseco shares were quoted as high as $84.00 a share (December 26, 1968) and did not fall below plaintiff's purchase price until March or April of 1969. After a disclosure letter to Aseco shareholders in June, 1969, Aseco shares were quoted in the range of $3.50 to $9.00 a share.

Aseco stock to date has a market value of no more than $1.00 a share.

*Conclusions of Law*

This court has jurisdiction, pursuant to 15 U.S.C. § 78aa,[4] over this cause of action brought under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 (17 C.F.R. 240.10b–5), promulgated thereunder by the Commission.

Section 10(b) requires that the transactions on which a claim is based involve " . . . the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange."

The series of negotiations between Pike and Rapanos, by interstate telephone calls and telegrams, involved the use of instrumentalities of interstate commerce sufficient to meet the requirements of Section 10(b).

Plaintiff has contended throughout the course of this trial that the defendants violated Section 10(b) and Rule 10b–5 by failing to disclose, prior to October 4, 1968, the loss of the C-Line business of International Harvester, the loss of the M–149 government contract and the negative working capital position of Aseco created by the acquisition of Deco Corporation on August 26, 1968.

Generally, the plaintiff, in a case alleging violations of Section 10(b) and Rule 10b–5, must prove not only that there was a false representation or omission of information by the defendant, but also that the alleged items of information were material to the plaintiff's decision to participate in the transaction and, in cases of false representation as distinguished from nondisclosure, that the plaintiff's loss was caused by his reliance on the alleged deception by the defendant.

A fundamental purpose, common to securities regulation statutes, is to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and to achieve a high standard of business ethics in the securities industry. SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); *Accord,* SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 855 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). *See,* Shell v. Hensley, 430 F.2d 819, 826–827 (5th Cir. 1970); SEC v. Great Am. Indus., Inc., 407 F.2d 453, 462–463 (2d Cir. 1968). (Kaufman, J., concurring), cert. denied, 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969); 3 L. Loss, Securities Regulation 1435 (2d ed. 1961).

There is no dispute in this case that defendant Rapanos was a "corporate insider" of Aseco. Given this status, therefore, his duty to disclose would rest first on a relationship giving ac-

4. 15 U.S.C. § 78aa provides in pertinent part:

"The district courts of the United States . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder . . . Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder . . . may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business . . . "

cess, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone, and second, on the inherent unfairness involved where a party takes advantage of such information knowing it is unavailable to those with whom he is dealing. In re Cady, Roberts & Co., 40 SEC 907, 911 (1961).[5]

Rapanos had direct access to information which led to his knowledge of the loss of the International Harvester business, the M–149 government contract and the negative working capital position of Aseco prior to October 4, 1968. His mere knowledge of these facts, however, does not mean the same information was not available to the plaintiff buying group. Fraud or deceit presupposes the superior knowledge of one party over another. SEC v. Coffey, el al., 493 F.2d 1304 at 1313 (6th Cir., decided and filed March 28, 1974) *See also,* Myzel v. Fields, 386 F.2d 718, 739 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968). There is no duty to disclose information to one who reasonably should already be aware of it. Kohler v. Kohler Co., 319 F.2d 634, 642 (7th Cir. 1963); Arber v. Essex Wire Corp., 490 F.2d 414, 420 (6th Cir. 1974); SEC v. Coffey, et al., *supra,* at 1313. The requirement that an investor act reasonably and exercise due care in light of all of the facts available to him "imposes a duty of reasonable investigation, thereby limiting the class of investors who will be protected under [Rule] 10b–5(b) to conscientious buyers and sellers in good faith." Clement A. Evans & Co. v. McAlpine, 434 F.2d 100 (5th Cir. 1970), cert. denied sub nom, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971); City National Bank of Fort Smith, Arkansas,

v. Vanderboom, 422 F.2d 221, 230 (8th Cir. 1970); Branham v. Material Systems Corp., 354 F.Supp. 1048, 1056 (S.D.Fla.1973).

Pike was the catalyst of the transaction between the plaintiff and defendants which gave rise to this action for alleged fraud. He had a keen interest in representing a group which would purchase enough stock to control Aseco. He was the only person who dealt directly with Rapanos prior to October 4, 1968. Before he met the plaintiff buying group he was in possession of financial data about Aseco that was both publicly disclosed and not disclosed. He attended the Aseco stockholders' meeting on June 7, 1968, where it was publicly disclosed that the International Harvester Corporation was taking a significant portion of their business into their own plant in the fall of 1968, and that Aseco had not been initially awarded the M–149 government contract. He knew Aseco had acquired Deco Corporation, as did the rest of the public, shortly after August 26, 1968. He also prepared representations and projections about Aseco's financial condition and future, based on published financial data about Aseco.

Knowledgeable of the contract status of the International Harvester and the M–149 government business, the acquisition of Deco Corporation, and armed with financial representations and his own projections about Aseco, which were basically erroneous, *a priori* judgments, Pike contacted Hooker and Hill about interest in acquiring Aseco stock. The knowledge acquired by Pike before he contacted the plaintiff buying group was also attributable to the members of the buying group. 4 F. Mecham, The Law of Agency, § 1803 (2d ed. 1914); Restatement (Second) of Agency, § 276

5. In *Cady,* the defendant was what would now be termed a tippee; nevertheless, in subsequent cases, courts have utilized the *Cady* language to define insiders. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S. Ct. 1454, 22 L.Ed.2d 756 (1969); Schoenbaum v. Firstbrook, 268 F.Supp. 385 (S.D.

N.Y.1967), aff'd, 405 F.2d 200 (2d Cir.), modified, 405 F.2d 215 (2d Cir. 1968), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L. Ed.2d 219 (1969); Ross v. Licht, 263 F. Supp. 395 (S.D.N.Y.1967).

Comment, Affiliated Ute Citizens v. United States—The Supreme Court Speaks on Rule 10b–5, 1973 Utah L.Rev. 123, n. 31.

(1958). Rapanos, therefore, did not have a duty to disclose this information since it was already known by the representative of the plaintiff buying group with whom he was dealing.

Plaintiff contends that defendant Rapanos failed to disclose the final award of the M–149 government contract to West Coast Machinery, which he knew on September 13, 1968, and that such information was a material fact with respect to plaintiff's decision to purchase Aseco stock on October 4, 1968.

■ The test of whether an undisclosed fact was material to the plaintiff's decision to buy in this case is an objective one. Rogen v. Ilikon Corp., 361 F.2d 260, 266 (1st Cir. 1966). "A fact is material, according to the Restatement of Torts, if 'its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction in question. 3538(2)(a)'." 6 L. Loss, Securities Regulation 3534 (2d ed. Supp. 1969). Although the Restatement's test of the reasonable man's probability of acting in light of undisclosed facts has not been universally followed,[6] the Sixth Circuit Court of Appeals, in Arber v. Essex Wire Corp., 490 F.2d 414 (6th Cir. 1974), gave it application by stating:

> We adhere to the test [applied] by the Second Circuit Court of Appeals in the landmark *Texas Gulf Sulphur* decision: whether a reasonable man would have attached importance to the undisclosed facts in determining his choice of action in the particular transaction in question. 401 F.2d at 849. *See also* Northwest Paper Corp. v. Thompson, 421 F.2d 137, 138 (9th Cir. 1970); Securities and Exchange

Commission v. Great American Industries, Inc., 407 F.2d 453, 459–460 (2d Cir. 1968), *cert. denied,* 395 U.S. 920, [89 S.Ct. 1770, 23 L.Ed.2d 237] (1969); List v. Fashion Park, Inc., 340 F.2d 457, 461–463 (2d Cir. 1965), *cert. denied,* 382 U.S. 811, [86 S.Ct. 23, 15 L.Ed.2d 60] (1966), 490 F.2d at 418.

■ Without addressing the plaintiff's business acumen with respect to the Aseco purchase, in light of all the information available to them through published material, Pike's investigation about the status of the M–149 government contract before September 13, 1968, the public statements of the failure to be awarded the contract made at the annual stockholders' meeting and the protests, plus the disapproval by Kleiner of the investment, the fact that Aseco had finally lost the M–149 government contract on September 13, 1968, neither would or might have affected the action of a reasonable person in the plaintiff's position.

The facts of this case also suggest a buyer who insisted on buying because of the confidence the buyer had in its representative, and that nothing that could be said or done by the seller would have overcome the buyer's insistence in investing in Aseco. If there was a Pied Piper of Aseco it was not Rapanos but Pike, the intimate representative of the plaintiff buying group, with whom Rapanos was dealing.

The damage sustained by the plaintiff in this case was not caused by the nondisclosure of the award of the government contract to West Coast Machinery or any other acts of the defendants.

Although proof of reliance is not a requirement in this case because the act of

6. The Restatement definition requires that the reasonable man *would* be affected by the misrepresentation. Some courts have required only that the reasonable man *might* have been affected, Affiliated Ute Citizens v. United States, 406 U.S. 128, 154, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); or that he *might well* have been affected, Chasins v. Smith, Barney & Co., 438 F.2d 1167, 1171 (2d Cir. 1970); or that he *could* have been affected, In re Investors Management Co., SEC Securities and Exchange Act Release No. 9267 (July 29, 1971), [1970–1971 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 78,163, at 80,519 (SEC 1971). *See generally,* Feit v. Leasco Data Processing Equip. Corp., 332 F.Supp. 544, 569–575 (E.D.N.Y.1971).

Rapanos was nondisclosure rather than false representation,[7] the plaintiff must still prove that its loss in this case was caused by the nondisclosure by Rapanos.

■ Rule 10b–5 is silent on the requirement of loss causation. But historically and logically, some causal connection between one person's misconduct and another's loss is necessary for private recovery under Rule 10b–5. Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir. 1967), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967); List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965), cert denied, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965); Baird v. Franklin, 141 F.2d 238 (2d Cir. 1944) [pre–10b–5, alleging implied liability for violations of SEA §§ 6 and 10(b)]; Trussell v. United Underwriters, Ltd., 228 F.Supp. 757, 771 (D.Colo.1964); . . . Restatement, Torts, § 286(d), . . . See Wittner v. Ghen, CCH par. 91,623 at p. 95,324 (1964–1966 Transfer Binder) (S.D.N.Y. Jan. 27, 1966). . . Cf. Lapchak v. Sisto, CCH par. 90,721 (1952–1956 Transfer Binder) (S.D.N.Y. July 20, 1955) . . . Cf. Prosser, Torts § 41 (3d ed. 1964); 2 A. Bromberg, Securities Law: Fraud, Sec. 8.7 (1), p. 213 [at] n. 57 (1973).

The plaintiff buying group knew, prior to October 4, 1968, that they were buying control of a job shop operation with no proprietary products, few customers, an inadequate working capital position and which would require constant and aggressive management. The management group after October 4, 1968, was lethargic in their efforts to find new business to replace the contracts they knew would expire in late 1968. Established business rapport with International Harvester, a major customer, was allowed to deteriorate. DeKruif, a key person in management and the most knowledgeable about Aseco operations, was lost and replaced by a person not competent or qualified to fill the management void left by deKruif.

The time and effort spent by the new management group in trying to merge Aseco and Whale between November, 1968, and May, 1969, proved to be misplaced not only because it did not secure new business for Aseco, but also because it inflated the value of Aseco stock in a

7. In Affiliated Ute Citizens v. United States, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the court relinquished the requirement of reliance in cases of nondisclosure. The court stated:

"Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material . . . This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." 406 U.S. at 153–154. See also, Arber v. Essex Wire Corp., 490 F.2d 414, 421, n. 7 (6th Cir. 1974).

The court also recognized that Affiliated Ute involved misrepresentations as well, 406 U.S. at 152, but it would be dangerous to take this case as authority for the proposition that reliance is not required in cases of misrepresentations. First, the court was able to find a pure omission by the defendants based on a failure to disclose the fact that they could gain financially from the transactions. The facts did not disclose any plaintiff to whom this fact was misrepresented. Thus, regardless of how many misrepresentations were made and not relied upon, this failure to disclose a material fact in light of a duty to do so was a sufficient basis for the court to impose liability. Second, the petitioner's brief stressed that this case involved a nondisclosure and urged that the reliance requirement should therefore be dispensed with. Brief for Petitioner at 32. Even Respondent Haslem's brief agreed that if this were a case based on an omission it might be appropriate to dispense with the reliance requirement. Brief for Respondent at 27, 31. However, the petitioner went further and invited the court to dispense with the reliance requirement in all cases arising under 10b–5. Brief for Petitioner at 32. Thus, the court had the option of eliminating the reliance requirement altogether or dispensing with it only in the context of nondisclosures. By prefacing its holding on the reliance requirement with the statement that Affiliated Ute involved primarily a failure to disclose, the court apparently chose to follow the latter option. Note, The Nature and Scope of the Reliance Requirement in Private Actions Under SEC Rule 10b–5, 24 Case W.Res.L.Rev. 385, n. 122 (1973).

corporation quickly running out of unreplaced business and viable business relations.

The loss of business of Aseco occasioned by the mismanagement of the plaintiff buying group, coupled with the collapse of the inflated stock value of Aseco created by the abortive Aseco-Whale merger attempt, was the cause of plaintiff's loss in this case, not the failure of defendant Rapanos to disclose the loss of the M–149 government contract on September 13, 1968, or any other act on his part.

Moreover, equity requires a party seeking rescission in a 10b–5 action to move promptly. Estate Counseling Service v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 303 F.2d 527, 532 (10th Cir. 1962); Baumel v. Rosen, 412 F.2d 571, 574 (4th Cir. 1969). "The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act." Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 213–214 (9th Cir. 1962); Hecht v. Harris, Upham & Co., 430 F.2d 1202 (9th Cir. 1970); Accord, Tobacco and Allied Stocks v. Transamerica Corp., 143 F. Supp. 323, 327 (D.Del.1956).

The plaintiff buying group knew and had access to information about the contract status of business with International Harvester and the United States Government, and the negative working capital position of Aseco, prior to and after October 4, 1968. No member of the plaintiff buying group, however, ever contacted defendant Rapanos about the loss of the International Harvester and M–149 government contracts, or the negative working capital position of Aseco, until this action was filed on March 3, 1970, seventeen (17) months after the purchase. During this time the management of Aseco by the plaintiff buying group caused the loss. Rapanos was not contacted when the value of Aseco stock reached $84.00 a share on December 26, 1968, or at any other time between October 4, 1968, and March or April, 1969, when the value of Aseco stock was never below the plaintiff's purchase price of $44.00 a share on October 4, 1968.

It appears to the court that the materiality of the allegedly undisclosed status of the International Harvester and M–149 government contracts, and the negative working capital position of Aseco prior to October 4, 1968, became important to the plaintiff buying group only after the value of Aseco stock had reached its irreversible nadir. Accordingly, plaintiff's delay in seeking rescission during a period when the value of Aseco stock did not fall below the purchase price on October 4, 1968, bars any claim for relief based on rescission by application of the equitable doctrine of laches. See, Costello v. United States, 365 U.S. 265, 282, 81 S.Ct. 534, 5 L.Ed. 2d 551 (1961); Hecht v. Harris, Upham & Co., 430 F.2d 1202, 1208 (9th Cir. 1970).

The plaintiff has not sustained its burden of proof in this case.

Plaintiff has not shown, by a preponderance of the evidence, that the status of the International Harvester and M–149 government contracts or the negative working capital position of Aseco, created by the acquisition of the Deco Corporation, were not disclosed by the defendants.

Plaintiff has not shown, by a preponderance of the evidence, that any other facts in this case were material to its decision to purchase the Aseco stock on October 4, 1968.

Finally, plaintiff has not shown, by a preponderance of the evidence, that the loss sustained by the plaintiff as a result of the purchase of the Aseco stock on October 4, 1968, was caused by any acts of the defendants.

For the foregoing reasons, it is adjudged that the plaintiff take nothing in this cause of action and that judgment be entered in favor of the defendants.

So ordered.