**CHELSEA ASSOCIATES, a Tennessee Partnership, Plaintiff-Appellant,**

**v.**

**John A. RAPANOS et al., Defendants-Appellees.**

**No. 74–2114.**

United States Court of Appeals, Sixth Circuit.

Argued April 8, 1975.

Decided Dec. 11, 1975.

---

1. *Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

Robert A. Fineman, Honigman, Miller,
Schwartz & Cohn, Edward F. Kickham,

Cyril Moscow, Detroit, Mich., for plaintiff-appellant.

Richard D. Rohr, Bodman, Longley, Bogle, Armstrong & Dahling, Detroit, Mich., Edward G. Durance, Durance, Sheldon & Rhead, Midland, Mich., for defendants-appellees.

Before PECK and ENGEL, Circuit Judges, and ALLEN *, District Judge.

ENGEL, Circuit Judge.

This is an appeal from a bench trial resulting in a dismissal upon the merits of an action by plaintiff Chelsea Associates charging defendants with violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, of the Securities Exchange Commission promulgated thereunder.[1] Chelsea Associates is a partnership of Tennessee businessmen which was organized solely for the purpose of purchasing shares of Aseco Corporation, a Michigan corporation whose stock was traded in the over-the-counter market. Aseco was essentially a "job shop" operation without any proprietary products of its own, relying instead for its business upon work sub-contracted from other manufacturers and contracts from the United States government.

Beginning in May, 1968, Hugh Pike, a Seattle broker in the firm of Hinton-Jones & Company, became involved in efforts to form a group to acquire control of Aseco. In late August, 1968, Pike met Henry Hooker, Albert Hill, and other Tennessee businessmen who were ultimately to form Chelsea Associates to explore the possibility of acquiring Aseco either directly or by merger with Whale

Electronics, Incorporated, a conglomerate located in Nashville, Tennessee, in which Hooker and other members of the proposed partnership had a controlling interest. The proposed acquisition of Aseco by Whale Electronics was discussed with Mr. Bert Kleiner, a New York investment banker, who strongly recommended against the investment; pointing out that Aseco was basically a job shop operation; that it was dependent primarily only on two customers, International Harvester and the United States government; and that it lacked an adequate working capital position. Mr. Kleiner also noted that anyone could get into the business and that, therefore, there was little advantage in paying for the privilege. Undeterred, Pike continued his efforts and eventually arranged a meeting on September 9, 1968 between Hill and DeKruif, who was at that time the president and chief operating officer at Aseco.

The target of the acquisition effort was John Rapanos, Chairman of the Board of Aseco and formerly its chief executive officer who with members of his family was the majority and controlling shareholder in the company. Rapanos initially rejected any overtures to sell his stock, but finally, on September 13, 1968, accepted an offer made by Pike on behalf of Chelsea to buy his and his family's shares at the current over-the-counter price of $44 a share, including commissions. The sale of the stock occurred on October 4, 1968, and was followed by Rapanos' retirement from active participation in the company. Pike and Hill were on that date elected to membership on the Board, and Hill re-

* Honorable Charles M. Allen, Judge, United States District Court for the Western District of Kentucky, sitting by designation.

1. C.F.R. § 240.10b–5 provides:

   It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

   (a) To employ any device, scheme, or artifice to defraud,

   (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made not misleading, or,

   (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

   in connection with the purchase or sale of any security.

placed Rapanos as Chairman of the Board.

This action was commenced in the district court seventeen months later on March 3, 1970. The complaint alleged that Section 10(b) and Rule 10b–5 were violated by the nondisclosure by Rapanos of certain information which was claimed to be in his possession prior to October 4, 1968, and which was material to any decision by Chelsea to purchase the Aseco stock. Specifically, Chelsea contends that Rapanos failed to disclose the following information:

1. That Aseco had, on August 26, 1968, acquired Deco Corporation by short-term debt and as a result had a negative working capital position.

2. That Aseco had lost the "C-Line" business of International Harvester Corporation upon which it had relied for a substantial percentage of its job shop business, and, finally,

3. That a contract with the United States Army for the production of M–149 water trailers had been finally awarded to a third party.

With respect to Rapanos' alleged failure to disclose information concerning the purchase of Deco Corporation, and the loss of the "C-Line" business of International Harvester, we are in agreement with the findings of District Judge Charles W. Joiner, as contained in his extensive opinion reported at 376 F.Supp. 929 (E.D.Mich.1974). Judge Joiner held that the circumstances of these events were known to Hugh Pike prior to Chelsea's purchase of the stock and that because Pike was acting on behalf of Chelsea and was its agent in the transaction, his knowledge was chargeable to Chelsea. These findings are not clearly erroneous and accordingly may not be disturbed on appeal.

The third issue, whether Rapanos violated Section 10(b) and Rule 10b–5 in failing to disclose the final status of the M–149 contract, requires more extended treatment. Unlike the first two issues, there is no claim that either Chelsea or Pike had knowledge that the M–149 con-

tract had been finally awarded to a third party.

Aseco for a number of years had been engaged in the production of M–149 portable water trailers for the United States Army. This business constituted approximately 30% to 40% of Aseco's total sales in the past. The current M–149 contract with the government was scheduled for completion in November, 1968. Aseco, in January, 1968, had bid upon a fourth M–149 contract to insure continued production of the trailers after November. However, Aseco was the third low bidder on this contract, being underbid by Arrow-Tech Corporation and West Coast Machinery, Inc. Aseco filed a protest against the award on the basis that Arrow-Tech was not a qualified bidder, and in addition obtained an option to acquire Arrow-Tech Corporation for $5,000 to assume that company's bidding position in the event the protest was denied. Pike was present at the Aseco shareholders' meeting on June 7, 1968, when the failure to obtain the contract award was explained by DeKruif to the shareholders. At the same time, DeKruif explained that, in view of their past success in producing the trailer, the management was reasonably confident it would ultimately secure the contract.

On September 13, 1968, the government rescinded its award to Arrow-Tech Corporation and awarded the contract instead to West Coast Machinery. Although Rapanos denied knowledge, the district judge found as a fact that he, as well as DeKruif, knew on September 13, 1968 that the M–149 contract was finally lost. The district judge further found that "Rapanos did not initiate any efforts to sell his stock. Instead he rejected a number of offers by Pike to buy him out. However, Rapanos decided to sell his stock and his family's stock in Aseco on September 13, 1968, and accepted Pike's offer to buy when he learned the M–149 government contract had been awarded to West Coast Machinery Corporation." The district judge concluded that the fact of the final award of the M–149 government con-

tract to West Coast Machinery was not material:

> Without addressing the plaintiff's business acumen with respect to the Aseco purchase, in light of all the information available to them through published material, Pike's investigation about the status of the M–149 government contract before September 13, 1968, the public statements of the failure to be awarded the contract made at the annual stockholders' meeting and the protests, plus the disapproval by Kleiner of the investment, the fact that Aseco had finally lost the M–149 government contract on September 13, 1968, neither would or might have affected the action of a reasonable person in the plaintiff's position.

*Chelsea Associates v. Rapanos,* 376 F.Supp. 929, 941 (E.D.Mich.1974).

It is the foregoing finding which forms the principal basis for attack by appellants, since, they argue, if disclosure of the award to West Coast Machinery was material enough to induce Rapanos to sell his stock, it was equally material to a decision of the Chelsea Associates in buying the stock. Thus, it is argued, the district court's determination to the contrary cannot stand.

This circuit in *Arber v. Essex Wire Corp.,* 490 F. 2d 414 (6th Cir. 1974), *cert. denied,* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974), adopted the objective test of materiality in 10b–5 actions as stated by the Second Circuit in *SEC v. Texas Gulf Sulphur Co.,* 401 F. 2d 833 (2nd Cir. 1968), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), a test based upon whether a reasonable man would have attached importance to the undisclosed facts in determining his choice of action in a particular transaction. *Arber v. Essex Wire Corp., supra,* at 418; *Texas Gulf Sulphur, supra,* at 849.

■ We agree with appellant that the importance a defendant insider attaches to information in deciding whether to purchase or sell stock is highly persuasive evidence of materiality. *SEC v.*

*Shapiro,* 494 F.2d 1301 (2nd Cir. 1974). However, we do not understand such evidence to be conclusive. The question is whether the district court's finding of non-materiality can be said to be clearly erroneous. *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 888 (2nd Cir. 1972); *Stier v. Smith,* 473 F.2d 1205, 1208 n. 9 (5th Cir. 1973).

When Rapanos' decision to sell his stock is considered in the light of all of the circumstances which existed at the time, the district court's finding of non-materiality comes into clearer perspective. Rapanos' knowledge that the contract had finally been awarded to West Coast Machinery was not, as urged by appellant, knowledge of the "loss" of the contract for it had never been Aseco's to lose. The contract had already been awarded to a competitor; this fact was known by the investors. There was no objective evidence that had Arrow-Tech been disqualified, the contract would have been awarded to Aseco rather than to the second-lowest bidder, West Coast. Also, inherent in a job shop operation is the reasonable expectation that losses of contracts frequently occur. Hill himself admitted there was no guarantee Aseco would obtain another government contract. Finally, the evidence strongly suggests that what prompted Rapanos to sell was his recognition, from reviews of the stock transfer sheets, that he was in the process of losing control of the company. As the district court opinion points out:

> "Rapanos knew of Pike's interest in getting control of Aseco and knew of the steady purchases of Aseco stock by Hinton-Jones for the west coast shareholders until the holdings of that group by the end of May, 1968, were approximately as large as the Rapanos family. He had reviewed subsequent monthly transfer sheets and these showed additional transfers to the west coast in June, July and August, 1968, which indicated that west coast shareholders may have more shares than the Rapanos family holdings, and

might have 30–40% of the outstanding Aseco stock. He did not wish to be in a business he could not control." 376 F.Supp. at 938.

■ Materiality depends "at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 849 (2nd Cir. 1968). We cannot say the district court's finding of non-materiality is clearly erroneous.

■ An additional basis for affirmance of the judgment is the finding by the district court, amply supported by the evidence, that plaintiff Chelsea would not in any event have relied upon the non-disclosed fact.[2] The district court held:

The facts of this case also suggest a buyer who insisted on buying because of the confidence the buyer had in its representative, and that nothing that could be said or done by the seller would have overcome the buyer's insistence in investing in Aseco. If there was a Pied Piper of Aseco it was not Rapanos but Pike, the intimate representative of the plaintiff buying group, with whom Rapanos was dealing. 376 F.Supp. at 941.

Although the district court found non-reliance, it felt precluded by the Supreme Court's opinion in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) from dismissing plaintiff's complaint on this theory. We, however, do not read *Affiliated Ute* so expansively.

■ In the usual fraud case or case brought for misrepresentation in violation of Rule 10b–5, proof of reliance upon the misstated or false fact is required *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2nd Cir. 1974),

cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Where however, the violation arises from the non-disclosure of a material fact, problems of proof arise because of difficulty in proving that the plaintiff relied upon the non-existence of the fact which ultimately was shown to have been present. Thus the Supreme Court in *Affiliated Ute* held that the district court's finding of liability for the non-disclosure of the true value of the UDC stock was not defeated by the failure of the plaintiffs to show that they relied upon the fact that the UDC stock was worth only what they were being paid for it.

"Under the circumstances of this case, involving primarily a failure to disclose, *positive* proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. . . . This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." (emphasis added)
*Affiliated Ute Citizens v. United States, supra,* 406 U.S. at 153, 154, 92 S.Ct. at 1472.

■ The Supreme Court's presumption of reliance meets the conceptual difficulty of proof of reliance on a negative fact. We, however, do not in any event understand the presumption to be conclusive:

"We do not read this decision to say that the question of reliance *vel non* may not be considered at all in a non-disclosure case, but only that proof of reliance is not required for recovery. If defendant is able to demonstrate that there was clearly no reliance, that is, that even if the material facts had been disclosed, plaintiff's decision as to

**2.** The difference between the elements of materiality and reliance is the difference between the inquiry of whether a reasonable man would have attached importance to the misrepresentation as opposed to whether the individual plaintiff attached importance to the misrepresentation. *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2nd Cir. 1965), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). The distinction is one of degree.

the transaction would not have been different from what it was, then the non-disclosure cannot be said to have caused the subsequent loss and under the ordinary principles of the law of fraud, recovery should be denied. . . . However, in light of the Supreme Court's holding in *Affiliated Ute,* the burden of proof rests squarely upon defendant to establish the 'non-reliance' of plaintiff."

*Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 410 (3rd Cir. 1974).

Accord, *Carras v. Burns,* 516 F.2d 251 (4th Cir. 1975). See Note, *The Reliance Requirements in Private Actions Under SEC Rule 10b–5,* 88 Harv.L.Rev. 584 (1975). We hold that the affirmative finding of the district court of non-reliance is sufficient to defeat recovery.[3]

The record shows that the plaintiff buying group did not view the final loss of the M–149 contract as a significant problem. The district court found that no member contacted Rapanos after October 4, 1968 with respect to the loss of the government contract. No concern was expressed by management over its loss in the October 31 meeting. DeKruif testified that he informed Pike about the loss of the contract and that he received what he "considered somewhat of a flip remark to the effect, well, that is . . He replied in effect that is next year's business, we'll worry about it then." The district court found that "[t]he principal management efforts of the plaintiff buying group subsequent to October 4, 1968 and through May, 1969 were devoted to trying to merge Aseco and Whale." The reason no emphasis was placed on

the loss of the M–149 contract is illuminated by the testimony of Pike. "[Whale] was expanding at such a rapid rate that they needed the production fill-in facilities and that they [Aseco] were built in ready to go with manpower." The district court states, "Moreover, throughout this period of attempted merger the Aseco plant managers had been assured that Whale had enough overflow business to keep the Aseco plants busy." While most of the above evidence occurred after the takeover of Aseco by Chelsea, it nonetheless casts significant light on the investors' merger plans before October 4, especially when considered in conjunction with the August conference with New York investment banker Bert Kleiner in which the possibility of an acquisition of Aseco by Whale was discussed. In conclusion, there is substantial evidence to support the district court's finding that there was "nothing that could be said or done by the seller [which] would have overcome the buyer's insistence in investing in Aseco." The disclosure of the fact that the M–149 contract had been finally awarded to a third party would not have altered the decision to purchase Aseco and ⋅ the attempted merger plans with Whale Electronics.

■ Plaintiff also alleges violations of the Michigan Uniform Securities Act, specifically M.C.L.A. § 451.810(a)(2) which similarly imposes liability for ". . . any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading . . .".[4] However

---

**3.** This question was not reached in *Arber v. Essex Wire Corp.,* 490 F.2d 414, 421 n. 7 (6th Cir. 1974).

**4.** Section 410(a)(2) of the Michigan Uniform Securities Act, M.C.L.A. § 451.810(a)(2), provides:

    (a) Any person who:

        *   *   *   *   *   *

    (2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under

which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

    Is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, together with interest at 6% per year from the date of payment, costs and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for

our agreement with the district judge that Pike's knowledge as an agent was chargeable to Chelsea, and that the failure to disclose the final status of the M–149 contract was not a material omission, is also fatal to recovery under M.C. L.A. § 451.810(a)(2).

In view of the foregoing findings, we do not think it necessary to pass upon the additional bases given by the trial court for its judgment of dismissal.

Affirmed.

damages if he no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the buyer disposed of it and interest at 6% per year from the date of disposition.