**John Wayne REEVES and Sherry Marie Reeves, wife, Plaintiffs-Appellants,**

v.

**POWER TOOLS, INC. and Omark Industries, Inc., Defendants-Appellees.**

**No. 72–1558.**

United States Court of Appeals,
Sixth Circuit.

Feb. 22, 1973.

---

James F. Schaeffer, Memphis, Tenn., for plaintiffs-appellants.

Leo Bearman, Jr., and W. Frank Crawford, Memphis, Tenn., for defendants-appellees; Law Firm of Leo Bearman, Leo Bearman, Jr., Memphis, Tenn., and James E. Leary, W. Frank Crawford, Thomason, Crawford & Hendrix, Memphis, Tenn., on brief.

Before PECK and LIVELY, Circuit Judges, and MORTON *, District Judge.

LIVELY, Circuit Judge.

This diversity action was filed by appellants Reeves to recover for serious personal injuries which the husband suffered when a cartridge exploded in a powder-activated tool which he was using in his employment as a sheet metal worker. Reeves was employed by Southern States Contractors, which is not a party to this action, and had several

* Honorable L. Clure Morton, United States District Judge for the Middle District of Tennessee, sitting by designation.

years' experience using various types of power tools. One of the appellees is Power Tools, Inc., (Power Tools) which owned the tool being used by John Reeves and had furnished it to Reeves' employer in consideration of an agreement by the employer to purchase all its requirements of studs and cartridges from Power Tools. At the conclusion of the case for the plaintiffs the District Court directed a verdict in favor of Omark, and the case proceeded with Power Tools as the only defendant. After lengthy deliberation the jury was unable to make a verdict and was discharged. Appropriate motions were made by the various parties, and upon reconsideration the court denied the plaintiffs' motion for a new trial as to Omark and granted the motion of Power Tools for judgment notwithstanding the verdict. Mr. and Mrs. Reeves have appealed both rulings.

The group of which Reeves was a part was engaged in hanging ducts on a building at Memphis State University when the injury occurred. Reeves testified that he noticed one of the hangers was crooked and determined that it would be necessary to replace it. The procedure used involved standing on a stepladder and placing a new stud in the ceiling. This was accomplished by use of a powder-activated tool manufactured by Omark and referred to by the witnesses as a "gun". The tool resembled a grease gun in appearance and was used to make strong fastenings directly to concrete or steel without the necessity of drilling holes. It had a firing chamber similar to that of a rifle or pistol and used specially loaded blank cartridges. The gun was held flush against the surface to which a fastening was being made and special fasteners were propelled into the concrete or steel. When the muzzle end was pressed against the surface, this cocked the mechanism, and a trigger was used to fire it. The tool was loaded by opening or "breeching" it where it was hinged, between the handle and the firing chamber. The fastener or stud was then inserted, followed by the cartridge, and the tool was closed before use. The cartridges were rim fired and there was an automatic extractor which partially removed the spent shell so that the operator could complete removal by hand.

Appellant John Reeves testified that he climbed a stepladder, loaded the gun with a stud and a shell, pressed it against the ceiling and pulled the trigger. Instead of firing, the gun just "clicked". He then opened it and discovered that the cartridge was still in the chamber and the extractor had by-passed it and was behind the live shell. He testified that he tried to close the gun, "bumping" it once or twice and that as he reopened it the shell went off. He testified that he was never able to close it completely after the misfire occurred.

The particular tool involved in the accident had been loaned by Power Tools to appellant's employer on August 20, 1969, and had been purchased from Omark by Power Tools on April 17, 1967. It was the only gun being used on this particular job and two or three men were using it. The workmen had earlier experienced some difficulty with the gun and a field representative of Power Tools had used sandpaper or emery cloth inside the chamber to break up carbon deposits and had cleaned it at the work site. The tool was locked up at night in a "gang box". When further trouble developed, the same representative picked up the tool one Friday afternoon and took it to the shop of Power Tools. He completely disassembled the gun and cleaned it throughly before returning it the following Monday morning. Ten working days later the accident occurred. This employee of Power Tools testified that it was his job to keep the tools of his employer repaired and in service until some part became worn, at which time they were taken out of service.

Omark delivered printed safety instructions, including procedures in case of misfire, with every new tool. However, Power Tools never loaned new tools and the president of Southern States as

well as Reeves and his immediate supervisor testified that no one had ever given them any written safety instructions. No mention of misfire procedures was made to Reeves, who said he had been told only that the tools were dangerous and he should be careful. He had never experienced a misfire in nearly seven years of using powder-activated tools and had never seen an extractor bypass a cartridge, leaving it in the chamber. The printed safety rules directed that in case of misfire, the operator wait fifteen seconds, then pull the trigger again. If the tool did not fire the second time, he was to keep it in place against the surface, open the breech, remove the cartridge and dispose of the cartridge by putting it in a bucket of water. Appellant testified that when the gun misfired, he removed the tool from the ceiling and opened it almost immediately and then attempted to force it closed with the live shell still in the chamber and the extractor above it.

A number of experts testified. Two who were called by the plaintiffs stated that they had taken the tool apart after the accident and found several abnormalities in it. The chamber was "bellmouthed" or larger at the top than at the bottom and the extractor shaft had a slight bow in it, giving it more play than normal. They both testified that it was possible to fire a cartridge which had been bypassed by slamming the extractor against the rim. It was agreed, however, that the spring on the extractor would not return it to its normal position with sufficient force to cause firing. These two witnesses stated that the enlargement of the chamber and bow in the extractor rod caused the extractor to fail to eject the live cartridge, but the cause of the misfire itself was not shown.

■■ In granting the motion for a directed verdict as to Omark, the District Court held that the plaintiffs had failed to prove the absence of any tampering or opportunity for tampering with the tool and cartridge after they left Omark's control. To recover from a manufacturer under the doctrine of strict liability a plaintiff in Tennessee must show that the product was in a harmful condition when it left the manufacturer's control. Ford Motor Company v. Lonon, 217 Tenn. 400, 420, 398 S. W.2d 240' (1965). In the *Lonon* case, the Supreme Court of Tennessee adopted Section 402A of 2 Restatement (Second) Torts (1965).[1] If there is no direct proof of its condition when it left the manufacturer's control the burden is on the plaintiff to show by a clear preponderance of the evidence that there was no opportunity for the product to have been tampered with after it left such control. Barbeau v. Roddy Manufacturing Company, 431 F.2d 989 (6th Cir. 1970); Coca-Cola Bottling Works v. Crow, 200 Tenn. 161, 166, 291 S.W.2d 589 (1956). The court ruled that the plaintiffs had failed to sustain this burden of proof.

The second theory on which the case had proceeded against Omark was the failure of a duty to warn of the dangers associated with the use of the tool. Neither Reeves nor his immediate supervisor ever saw the printed instructions or received any specific warning about misfires. In Trimble v. Irwin, 59 Tenn.App.

1. Sec. 402A. Special Liability of the Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property if

  (a) the seller is engaged in the business of selling such a product, and

  (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

  (a) the seller has exercised all possible care in the preparation and sale of his product, and

  (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

465, 441 S.W.2d 818 (1968), the Tennessee Court held:

"An adequate warning is one calculated to bring home to a reasonably prudent user of the product the nature and the extent of the danger involved in using the product." 441 S.W.2d at 822.

The District Court found that when Omark delivered to Power Tools the printed instructions with respect to procedures to be followed in event of a misfire, it had a right to expect the warnings to be passed along to the ultimate user.

We believe the trial judge properly disposed of the claims against Omark. There was not sufficient evidence of a defect in the cartridge which misfired and then exploded to justify submitting any issue to the jury related to it. With respect to the tool, or "gun", the record shows that it was not new, that it had been serviced at least once by Power Tools and that the defects were more likely related to long use than to a harmful condition when it left Omark's control. There being no evidence of its condition at that time, appellants were required to show a lack of opportunity for tampering thereafter. This they did not do. We also agree that Omark adequately discharged its duty to warn of the dangerous nature of the tool by distributing printed instructions complete with diagrams and illustrations with each new tool that it sold or delivered. Thus, looking at the evidence and reasonable inferences in the light most favorable to appellants, De-Garmo v. City of Alcoa, 332 F.2d 403 (6th Cir. 1964), Judge Wellford properly concluded that no jury issue existed as to the appellee Omark.

The claim against Power Tools is more difficult. There is no dispute that Power Tools furnished the tool involved in the accident, that it never delivered to Reeves or his superiors at Southern States the printed safety rules prepared by Omark and that its employee cleaned and serviced the tool approximately ten days before the accident. This employee testified that he did not notice that the chamber was bell-mouthed or that the extractor shaft was bowed and he had no instrument to measure the chamber. After inspection he determined that the tool was "Okay" and took it back to Reeves on the job site. One of the complaints which had caused the representative of Power Tools to examine the tool was that the extractor was not working properly, that at times it was ripping the rim off the used cartridges.

The District Court held that even if these acts and omissions of Power Tools constituted negligence, this negligence created a "static" condition of danger which was safe until the appellant tried to bump or slam the chamber shut and then reopened it. The following language from Friendship Telephone Co. v. Russom, 43 Tenn.App. 441, 450, 309 S.W.2d 416, 421 (1958), was cited in support of this finding:

"Some cases do draw a distinction between the 'cause' of harm and the 'condition' in which the harm happened. It is said that if defendant's act created only a passive, static condition which made the harm possible, he is not liable. . . .

"So far as the distinction has any validity at all, it must refer to the type of case where the forces set in operation by the defendant have come to rest in a position of apparent safety, and some new force intervenes. But even in such cases, it is not the distinction between 'cause' and 'condition' which is important, but the nature of the risk and the character of the intervening cause."

The judge concluded that appellant's "injuries were the result of his own conscious act which was sufficiently unpredictable so as not to come within the scope of defendant Power Tools' reasonable apprehension." He did not hold that Reeves' conduct in "bumping" and reopening the tool constituted contributory negligence, but that it constituted an intervening act which was independent and conscious. Ford Motor Co. v. Wagoner, 183 Tenn. 392, 192 S.W.2d 840

(1946). Although Reeves had some seven years experience with power tools and had owned several firearms, he had never been confronted with a misfire or instructed on safety precautions in the event of such a happening. Although he knew that there was a general danger in handling powder-activated tools, the record does not warrant a holding that he must have recognized the precise danger which confronted him when his tool failed to fire.

■■ The defense of independent intervening act does not absolve a tort feasor from liability unless the forces set in operation by him have come to rest in a position of apparent safety before the new force intervenes. Power Tools, as supplier of the tool to appellant's employer had a duty at least to pass on the warning of danger it had received from the manufacturer. 2 Restatement (Second) Torts § 388 (1965); Trimble v. Irwin, *supra*, at 822. As the owner-lender of the tool who undertook to maintain it in good working order, Power Tools cleaned and tested it approximately ten days before the accident and did not notice the defects which were found to exist upon expert examination of the tool after the accident.

■■ Judgment notwithstanding the verdict is not proper unless the evidence is such that there can be but one reasonable conclusion as to the proper verdict. It should not be granted if there is a conflict in the evidence, and credibility of evidence is not to be considered in passing on a motion for judgment. Greer v. United States, 408 F.2d 631 (6th Cir. 1969); Moore's Federal Practice, Par. 50.07(2) (Second Edition). We believe that if this test is applied to the record in the present case there is

evidence from which a properly instructed jury could find that there existed a duty upon Power Tools to warn appellant of the danger of improper handling of the tool following a misfire. Furthermore, a jury could properly find that the defects in the tool should have been discovered by Power Tools when it had the tool in its possession for maintenance. 2 Restatement (Second) Torts (1965) § 403.[2] The jury could further have found that failure to discover the defects created the condition which led directly to appellant's injury, and that the forces set in motion by the failure to warn of the very danger which appellant faced when the tool misfired had not become static, but were still operating when he undertook to reactivate the tool by forcing it closed. In short, we find that jury issues existed as to whether the acts or omissions of Power Tools were such as to create liability to appellant and also whether the conduct of appellant after the tool misfired constituted an intervening act which was independent and conscious. Ginsburg v. Insurance Company of North America, 427 F.2d 1318 (6th Cir. 1970). Upon another trial, if the evidence is substantially the same, these issues should be presented to the jury along with all other issues properly developed.

The judgment is affirmed as to the appellee Omark Industries, Inc. and reversed as to the appellee Power Tools, Inc. A new trial is granted as to all issues between appellants and appellee Power Tools, Inc. Appellants shall pay the costs taxed in their appeal from the judgment in favor of Omark and appellee Power Tools, Inc. shall pay the costs taxed in the appeal from the order granting it judgment notwithstanding the verdict.

2. § 403
  "Chattel known to be dangerous—One who as an independent contractor makes, rebuilds, or repairs a chattel for another and turns it over to the other, knowing or having reason to know that his work has made it dangerous for the use for which it is turned over, is subject to the same liability as if he supplied the chattel."