865 F.2d 257
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Edwin M. GARVIN, Lee G. Keith, and the Wheeland Company, A
Limited Co-Partnership, Plaintiffs-Appellants,
Cross-Appellees,
v.
Joseph F. EHLEN, Frank Borschke, and Doeren Mayhew and
Company, A Michigan Co-Partnership,
Defendants-Appellees, Cross-Appellants.
 Nos. 87-1300, 87-1347, 87-1348 and 87-1925.
 United States Court of Appeals, Sixth Circuit.
 Dec. 28, 1988.
 
 Before BOYCE F. MARTIN, Jr. and WELLFORD, Circuit Judges, and JULIA S. GIBBONS*, District Judge.
 WELLFORD, Circuit Judge.
 
 
 1
 Edwin Garvin and Lee Keith, two of the three shareholders and principals in Metro Truck Sales, Inc. (Metro),[1] a diesel truck distributor in the Detroit area, instituted this action under Sec. 22 and Sec. 17(a) of the Securities Act of 1933, 15 U.S.C. Sec. 77(V) and Sec. 77(Q)(a); Sec. 27 of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78(aa), Sec. 78(j)(6); and Rule 10(b)(5) against the third (and majority) shareholder in Metro, Joseph Ehlen; the accountants for Metro, Doeren Mayhew and Company (Mayhew); and an individual partner in the Mayhew firm, Frank Borschke. The Wheeland Company (Wheeland), "a Michigan limited co-partnership" as described in the amended complaint, joined the suit as owner of the premises occupied by Metro.[2] In addition to the claims based on alleged violations of the federal securities laws, plaintiffs asserted common law fraud claims against the defendants, but these were withdrawn prior to submission of the case to the jury. Plaintiffs also sued defendant Ehlen for misrepresentations and material omissions of fact under the Michigan Uniform Securities Act, Mich.Comp.Laws Ann. Sec. 451.810 and Mich.Stat.Ann. Sec. 19.776(410)(a), and sued Mayhew and Borschke for violation of fiduciary duties as accountants and for malpractice.
 
 
 2
 By virtue of the various theories advanced by plaintiffs in their amended complaint, they asserted compensatory damage claims in the approximate total amount of $206,000. This sum arose out of the purchase in late 1979 by Garvin and Keith of Ehlen's controlling 55% interest in Metro, plus punitive damages. After the trial and the overruling of defendants' motions for directed verdicts, the jury initially returned a verdict for plaintiffs Garvin and Keith against Ehlen for $53,000 under the Exchange Act and a similar verdict for these plaintiffs against Borschke (not Mayhew). In addition, the jury awarded Garvin and Keith $103,000 against Ehlen under the Michigan Securities Act. Plaintiffs objected, the district court refused to accept this initial decision, and the jury was charged to deliberate further over defendants' objections. The jury eventually returned a verdict of $103,000 for each plaintiff under the Exchange Act against both Ehlen and Borschke (not Mayhew), and a similar $103,000 verdict for Garvin and Keith against Ehlen under the Michigan securities act. Defendants Ehlen and Borschke filed motions for judgment notwithstanding the verdict. These motions were granted by the district court, thus setting aside entirely the favorable verdicts for the plaintiffs.
 
 
 3
 Attorneys for both parties sought substantial assessments of attorneys' fees against their adversaries, and an assessment was made by the district court as a sanction under the Local Rules of the Court in favor of defendants against plaintiffs. Plaintiffs have appealed the district court's grant of defendants' motions for judgments n.o.v. and requests for attorneys' fees. Defendants Ehlen and Borschke have filed cross-appeals with respect to the denial of their motions for conditional grants of a new trial based on errors which allegedly occurred during the course of the trial.
 
 
 4
 The district court held prior to trial that the statute of limitations barred plaintiffs' claim of malpractice and breach of fiduciary duty against Mayhew. Plaintiffs also appeal this ruling by the district court.
 
 
 5
 As submitted by plaintiffs in their appellate brief, Toth v. Yoder Co., 749 F.2d 1190 (6th Cir.1984), holds that the Michigan standard for judgment notwithstanding the verdict is the legal equivalent to the standard in federal court and consists of a "reasonable minds" test. ("[U]nder this standard, a judgment n.o.v. may not be granted unless reasonable minds could differ as to the conclusions to be drawn from the evidence.") Id. at 1194. Another way of stating the standard is "whether there is sufficient evidence to raise a question of fact for the jury." Id; see also Warkentien v. Vondracek, 633 F.2d 1, 7 (6th Cir.1980); Cormack v. American Underwriters Corp., 94 Mich.App. 379, 288 N.W.2d 634 (1979). Accordingly, we apply this standard to all of the issues on appeal involving judgments n.o.v., regardless of whether they arise from the federal or the Michigan law claims. We do not pass on the credibility of the witnesses or substitute our judgment for that of the jury, and we view the evidence in a light favorable to the appellants insofar as the judgment n.o.v. is concerned. Toth, 749 F.2d at 1194-95; O'Neill v. Kiledjian, 511 F.2d 511 (6th Cir.1975); Reeves v. Power Tools, Inc., 474 F.2d 375 (6th Cir.1973).
 
 A. The Malpractice Claims
 
 6
 The Mayhew accounting firm was joined as a defendant in this case on November 30, 1983, some four years after the last of the alleged acts of negligence or alleged omission of pertinent information occurred. This was, at the very least, more than one year after plaintiffs assertedly discovered a potential conflict of interest involving Borschke, an individual partner in Mayhew, who failed to disclose his association with Ehlen in a separate business entity, Royal Computers. Royal Computers sold a computer to Metro in 1978 or 1979. In April 1980, Garvin wrote a letter complaining about "totally inadequate" accounting services provided by Mayhew. Moreover, Wheeland and Metro filed a separate accounting malpractice claim against Mayhew in 1981, well over a year before the original complaint in this action was filed. Under Michigan law, a malpractice claim must be brought within two years of discontinuance of the services which gave rise to the malpractice claim, or six months following discovery of the malpractice, whichever is later. Mich.Comp.Laws Ann. Secs. 600.5805(3), 600.5838; Mich.Stat.Ann. Secs. 27A.5805(3), 27A.5838. Because the plaintiffs failed to file suit within the statutory period, we find that their claims against Mayhew and Borschke for accounting malpractice, negligence, and breach of duty in their accounting services are clearly foreclosed as a matter of law.
 
 B. Role of Parties in Metro
 1. Garvin
 
 7
 Garvin testified that he was a business administration major who had completed several accounting courses, and that prior to his active participation as a corporate officer in Metro, he had served as a general manager of a predecessor trucking operation. Garvin made little or no actual "investment" of money in his 25% interest in Metro. From the outset, the three Metro shareholders agreed that Garvin and Keith were to manage the day-to-day operations of the company because Ehlen had no trucking business or dealership background. Garvin and Keith "split" the management responsibilities in Metro, with Garvin serving as president and treasurer or chief financial officer. Garvin claimed that these were mere titles, but conceded his substantial role in managing the business. Garvin admitted that at times he and/or Keith "held checks" or delayed their being cashed in order to obtain sufficient bank funds for the Metro checks to clear. Garvin also admitted that while Ehlen regularly spent time at Metro, he had "no function" in the business.[3] Finally, Garvin testified that it was he and Keith who had "built the dealership."
 
 2. Keith
 
 8
 Keith, who had experience dealing with and analyzing financial statements before his association with Metro, testified that "I was very concerned with knowing what was going on in the corporation ... so I made myself secretary." As secretary, Keith kept the minutes and official records of Metro. In addition, he was both sales manager and vice president for Metro from 1975 through the period in question. Like Garvin, Keith made no actual cash outlay for his 20% interest in Metro, which he acquired from Garvin as an incentive to induce him to come and help operate Metro. Keith and Garvin expanded Metro's operations from General Motors trucks to Freightliner, from which Metro acquired a franchise in 1977.
 
 
 9
 Keith was the initiator of the effort to obtain a new accountant for Metro, which effort resulted in the employment of Borschke and Mayhew. Keith interviewed and originally recommended approval of Borschke, who had assisted him with his personal taxes. Borschke advised and assisted Garvin and Keith about forming both the Wheeland Company, a co-partnership, Independence Underwriting, a separate entity, which the two might use to augment their personal incomes by means of rental income and insurance commissions on business generated by and through Metro.
 
 3. Ehlen
 
 10
 Ehlen was primarily concerned about his financial investment in Metro, which he acquired as a General Motors truck franchisee by reason of a substantial indebtedness owed to him by Walter Roney, the uncle of Mrs. Garvin. When Keith and Garvin insisted on hiring an accountant for Metro, Ehlen acquiesced in their selection of Borschke and Mayhew, who were experienced in handling accounting matters for automobile dealerships. All agreed that formal audits were not required and were too expensive, but the accountants did set up new systems for Metro. Borschke apparently performed personal accounting services for all three shareholders in Metro, which also employed a corporate attorney, Jimm White. For asserted tax purposes, Ehlen desired to convert his preferred stock into common stock or to liquidate his interest in Metro during 1979. He likewise wished to liquidate the indebtedness owed to him by Metro. At a directors meeting in February 1979, the three principals met with Borschke and White to discuss a corporate restructuring, proposed by Ehlen, which might seriously diminish Garvin and Keith's equity position. Later, Borschke met with Garvin and Keith to suggest various alternatives, including a buy out of Ehlen, mortgage financing of the real estate owned by Wheeland, and a dealer development loan for Metro from General Motors or from Freightliner.
 
 C. The Buy Out
 
 11
 Negotiations between the shareholders in Metro persisted for a number of months, and ultimately resulted in a buy out agreement dated October 17, 1979. This agreement provided that Garvin and Keith would acquire all of Ehlen's stock and other interests in Metro for a total purchase price of approximately $206,000, the amount Ehlen claimed as his total "investment" in Metro. The agreement also provided that Ehlen would loan Metro $206,500 for working capital, represented by a promissory note. (Metro was already obligated to Ehlen for advances made.) The Ehlen loan was contingent upon Freightliner's guaranteeing payment of the promissory note. Upon obtaining Freightliner's approval of the October buy out agreement, the deal was completed in December 1979.
 
 D. Security Act Violations
 
 12
 Keith and Garvin claimed in the federal securities act cause of action that the worth or value of Metro was materially misrepresented to them by Ehlen and Borschke, and that the latter two had an undisclosed relationship that violated the securities laws and breached their fiduciary responsibilities. In order to make out a viable claim of securities fraud, plaintiffs must produce some proof of a material misstatement or omission, made with intent to deceive or with recklessness as to its truth or falsity, which resulted in the purchase of a security that was worth less than they were led to believe. Basic, Inc. v. Levinson, 108 S.Ct. 978 (1988); M & B Contracting Corp. v. Dale, 795 F.2d 531, 536 (6th Cir.1986); Mansbach v. Prescott, Ball & Turben, 598 F.2d 1017, 1026 (6th Cir.1979).
 
 
 13
 Plaintiffs' theory is that Borschke and Ehlen conspired together to convince Garvin and Keith that they should buy Ehlen's interest in Metro, and failed to tell them that the business was in trouble, or that the business was worth much less than the books and records reflected at the end of 1978. Proof of this motive to deceive is allegedly found in Borschke's secret partnership with Ehlen in Royal Computers. Plaintiffs seek to establish causation by contending that had they known of Borschke's partnership with Ehlen in the computer business, they would have obtained an outside assessment of Metro's worth and would have discovered Metro's financial difficulties or that Borschke and Mayhew's unaudited statements of Metro were incorrect.
 
 
 14
 Plaintiffs, however, also must show that the Borschke-Ehlen representation of Metro's worth was misleading or false and that it was "material." A material fact is one which would have likely influenced a reasonable investor to change his mind, given the "total mix" of information available to him in the individual case. Basic, Inc., 108 S.Ct. at 983; TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). However, a defendant charged with a security act violation cannot be held liable when the plaintiff knew the situation equally well or better than the defendant. Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 530 (7th Cir.1985); Seaboard World Airlines, Inc. v. Tiger International, 600 F.2d 355 (2d Cir.1979).
 
 
 15
 Garvin was the chief financial officer for Metro, and had some measure of accounting background. He had been able to discern, for example, that a 1976 yearly financial report on Metro contained mistakes. There is undisputed testimony that Garvin knew that Metro's books needed substantial adjustments with respect to certain documents and assets reflected in 1978, and refused to allow them. This substantially negates his ability to say that he was surprised to learn Metro was worth less than what its 1978 and early 1979 statements reflected.
 
 
 16
 A Touche, Ross audit, directed by Freightliner, and completed in early 1980, was different from Borschke's yearly reports because Touche, Ross made several accounting adjustments which reflected such things as the improbability that Metro would be paid on certain delinquent accounts which had not been written off. Garvin and Keith were aware of the circumstances of these accounts. Plaintiffs' own witness, Keith Penner, who was associated with Mayhew, testified that Borschke and Mayhew discussed making similar adjustments with Garvin, but Garvin refused to allow them because they would detract from the company's financial position. Evidence also exists to show that Garvin, with Keith's knowledge, would float checks in substantial amounts past the end of the month to make the books reflect more cash on hand than actually was available. Thus, the unaudited statements were inaccurate to some degree. Penner's testimony was unrebutted that he told Garvin about various adjustments that should be made. Garvin and Keith then had reason to know that the value of Metro, as reflected by Borschke's unaudited reports, was not an entirely accurate reflection of Metro's actual financial situation.
 
 
 17
 Giving plaintiff Garvin reasonable inferences from the entire record, but based primarily on his own testimony, we believe it is clear that he was the active and principal officer in charge of operations at Metro, and that, as a matter of law, he is charged with knowledge of the financial condition of Metro during the entire relevant period. He simply is not in a position to complain that he was misled by the accountant and/or Ehlen. He is charged with knowledge of the totality of circumstances bearing upon the financial condition of Metro. Neither may Garvin be heard, under the overwhelming burden of facts evident in this record, to assert that he relied upon alleged material misrepresentations concerning the financial condition and value of the company because he was in a superior position to know the true facts. Teamsters Local 282 Pension Trust Fund v. Angelos, 762 F.2d 522, 530 (7th Cir.1985). The relationship in a computer business between Ehlen and Borschke is not significant in this respect.
 
 
 18
 A principal contention of plaintiffs was that Borschke, unknown to Garvin and Keith, became a silent partner with Ehlen in a company known as Royal Computers, which sold Metro a business computer system. While there is dispute about Borschke's exact role in Royal Computers, no proof establishes that the transaction between Metro and Royal Computers was detrimental or unfair to Metro or to plaintiffs. We deem the existence of such a partnership to be essentially irrelevant to the issues in the case.
 
 
 19
 The claims of plaintiffs in this three-person, closely held corporation against a fellow shareholder are not compatible with a claim for violation of the securities laws.[4] What has been said as to Garvin's claim based on violations of the securities laws also applies to Keith. We find no error, therefore, in the district court's grant of a judgment to defendants notwithstanding the verdict with respect to the federal securities act cause of action. Our decision on the federal securities act claims also applies to the similar Michigan securities act claims. See Chelsea Associates v. Rapanos, 376 F.Supp. 929 (E.D.Mich.), aff'd, 527 F.2d 1266, 1272 (6th Cir.1975). Plaintiffs cite no Michigan case law to support of their state claim.
 
 
 20
 We do not base our decision to affirm the grant of judgment n.o.v. to defendants on mere negligence or failure of plaintiffs to ascertain the facts clearly available to them as president, vice-president, secretary, and treasurer of Metro. We conclude that based on the facts and the record in this case, plaintiffs have no basis for a claim of justifiable or reasonable reliance on alleged misstatements or omissions by defendants Ehlen or Borschke.
 
 
 21
 We find, moreover, a failure under the circumstances to demonstrate that the claimed loss of plaintiffs' investment by reason of their purchase of Ehlen's interest in Metro was proximately caused by any alleged misrepresentation and/or omission of facts in Borschke's opinion or statement concerning the reasonable worth of Metro. Borschke was not a party to the transaction. In view of our conclusions aforesaid in respect to plaintiffs' claims, we do not find it necessary to determine whether the alleged misrepresentations concerning value in the form of claimed misstatements on the financial reports were proved to establish scienter as a matter of law. Ehlen, in any event, was not shown to have acted in violation of the securities laws in either of these respects. There was no foundation for a claim of rescission. In addition, there was no basis to indicate that Ehlen's stock in question was worthless based on any statement[5] furnished by Borschke for a period in 1978 or early 1979.[6] The "final" jury verdicts representing the total amount of consideration paid for the stock plus assumption of indebtedness would, therefore, have to be set aside as unfounded and unsupported.[7]
 
 
 22
 Regarding plaintiffs' reliance upon alleged representations by defendants based on the unaudited financial statement's reflection of Metro's net worth, a representative of Mayhew advised plaintiffs before closing that there were many concerns about Metro's financial position, including: (1) "always running a [cash] deficit"; (2) "accounts receivable problems"; (3) leaving "books open past the end of the year"; (4) "inventory"; (5) "warranty claims"; (6) accruals ("nobody really has any idea of what is in this account"); and (6) "losses in the past few years." Freightliner also advised plaintiffs (and Ehlen) in June 1979 about "major problems" concerning "cash flow" and "capitalization" of Metro, and that the parts and service receivables were substantially overstated. (Keith should not have been in charge of both sales and credit.) In addition, at that same time, Freightliner advised plaintiffs about warranty receivables that were "significantly overstated"; concerns about its old inventory; lack of "tight controls" in purchasing; and a personnel expense which was "significantly out of line." In short, Freightliner warned that from $369,000 to $584,000 was "needed in your operation." Plaintiffs were fully aware of these problems and concerns before entering into the buy out agreement with Ehlen. Plaintiffs admitted, moreover, that unforeseen actions by General Motors and developments in the economy seriously and adversely impacted upon Metro soon after the closing in 1979.
 
 D. Attorneys' Fees
 
 23
 The district court directed Garvin and Keith to pay the defendants' fees and costs under court rule 32(j)(3), which requires a plaintiff rejecting a mediation panel's award to pay the cost of defending the suit if the award received in court was not 10% greater than the mediation award.[8] Because their case ultimately resulted in no recovery, the court imposed sanctions against both plaintiffs under the rule, awarding Ehlen $12,600, and Borschke and Mayhew $13,680, together with court costs. (This award represented a reduction from the $30,259.50 requested by Borschke and Mayhew.) Plaintiffs did not challenge the amount of fees requested by Ehlen, but instead protested the award of any fee.
 
 
 24
 The plaintiffs claim that the court rule does not contemplate the award of sanctions when a motion for judgment n.o.v. has been granted, and notes that Black's Law Dictionary defines "verdict" as a judgment rendered by a jury. Neither side has produced any cases discussing this issue. Rule 32(j)(3) obviously seeks to encourage acceptance of mediation awards by threatening to award "costs" to the adversary party if the ultimate award is not substantially higher.
 
 
 25
 Under the American rule, attorneys' fees ordinarily are not assessed against the unsuccessful party absent express statutory authority. Davis & Cox v. Summa Corp., 751 F.2d 1507 (9th Cir.1985); Christensen v. Kiewit-Murdock Investment Corp., 815 F.2d 206 (2d Cir.), cert. denied, 108 S.Ct. 250 (1987). The rule which is the basis for the attorneys' fee sanction award refers to "a verdict" and to "actual costs," not to a final judgment n.o.v. or to attorneys' fees as such. Plaintiffs did obtain a verdict against both Ehlen and Borschke although this verdict which was subject to the later motion to set it aside. In the exercise of our equitable jurisdiction in this case, considering all of the circumstances, we set aside the awards of attorneys' fees as sanctions. Costs, of course, may be assessed in favor of defendants against both plaintiffs, but costs would exclude attorneys' fees. It is for the district court for the Eastern District of Michigan to decide whether to amend Rule 32(j)(3) in light of this decision in order to clarify, if that is its intent, whether sanctions of attorneys' fees as part of "costs" may be assessed if a final verdict, as may be finally approved by the court, may trigger such an assessment if the conditions and parameters are otherwise met. See Zackaroff v. Koch Transfer Co., Nos. 88-3097/3133 (6th Cir. Dec. 7, 1988).
 
 
 26
 In sum, we AFFIRM the judgment of the district court except to the extent it included an award of attorneys' fees in favor of defendants against the plaintiffs.
 
 
 
 *
 THE HONORABLE JULIA S. GIBBONS, United States District Court for the Western District of Tennessee, sitting by designation
 
 
 [1]
 Garvin referred to Metro as Metro GMC Truck Center in his testimony at trial
 
 
 [2]
 Wheeland is sometimes referred to as a corporation. Garvin and Keith were the only principals in Wheeland
 
 
 [3]
 Garvin and Keith knew that Ehlen was actively involved in several other businesses at the pertinent times. Ehlen drew a $30,000 salary from Metro. Garvin testified that he "wanted Joe [Ehlen] to be involved" in Metro because he believed him to be a very wealthy businessman, but that Keith resented Ehlen's taking a salary. Ehlen is the uncle of Garvin's wife
 
 
 [4]
 Glick v. Campagna, 613 F.2d 31 (3d Cir.1979), cited by plaintiffs, is not persuasive authority to the contrary. That case involved a defendant, who was the sole manager and operator of a close corporation and a plaintiff who was a mere investor and loaned money to the corporation. Judge Weis in that case noted:
 The stock of small, close corporations, such as WMFI here, Duralite in Thomas v. Duralite, 524 F.2d 577 (3d Cir.1975), and a similar-sized operation in Rochez Bros., Inc. v. Rhoades, 491 F.2d 402 (3d Cir.1973), is not the subject of the market manipulation that Congress sought to curtail when it enacted the securities laws.
 613 F.2d at 35 n. 3.
 Other cases cited by plaintiff purporting to support a finding of securities law violation in the case of small, closely held corporations are similarly inopposite or unpersuasive.
 
 
 [5]
 Whether deemed an opinion or a statement, Borschke's alleged misleading indication was not shown to be made, on this proof, "with reckless disregard for its truth or falsity" or without a belief that it was reasonably correct. See Eisenberg v. Gagnon, 766 F.2d 770, 776 (3d Cir.), cert. denied sub nom. Weinstein v. Eisenberg, 474 U.S. 946 (1985). Compare Marx v. Computer Sciences Corp., 507 F.2d 485, 490 n. 8 (9th Cir.1974) ("carelessly or recklessly made")
 
 
 [6]
 The October 31, 1978 unaudited statement of Metro showed a net worth of some $332,000, the major assets being inventory and trade accounts receivable. Major liabilities were trade accounts payable and notes payable (including $137,500 in notes to Ehlen). There was a substantial deficit in "retained earnings," although a smaller deficit than at the previous year end. The unaudited statement showed substantial losses from operations ($48,000 as of October 31, 1978, as compared to $98,000 as of October 31, 1977). There was no evidence to show that operations were in fact profitable. There was also a $37,500 arrearage on preferred stock dividends due Ehlen as of October 31, 1978
 
 
 [7]
 In view of our decision finding no error in the judgment for defendants notwithstanding the verdict, we are also not called upon to consider the appropriateness of the district court's handling of the "original" jury verdicts by reason of the objection of plaintiffs. We need not also consider in view of our affirmance, the impact on damages claims of Garvin and Keith based on their recovery against Freightliner on a basis of assertions similar to those made by them against Borschke and Mayhew
 
 
 [8]
 The court rule in question provides:
 If the Mediation Panel's evaluation is unanimous and the defendant accepts the evaluation but the plaintiff rejects it and the matter proceeds to trial, the plaintiff must obtain a verdict in an amount which, when interest on the amount and costs from the date of filing of the complaint to the date of evaluation are added, is more than 10 percent greater than the evaluation in order to avoid the payment of actual costs to the defendant.
 E.D.Mich.R. 32(j)(3).