894 F.2d 1336
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Anthony J. LOLLI, Plaintiff-Appellee,
v.
Leonard F. ZALLER; Edmund Stinn; Thomas V. O'Connell;
Benjamin Rabin; Satellite Communications Network,
Inc.; Electronic Products Corp.; Great
Lakes Media, Inc.,
Defendants-Appellants.
 Nos. 88-3869, 88-3907.
 United States Court of Appeals, Sixth Circuit.
 Feb. 2, 1990.
 
 Before WELLFORD and ALAN E. NORRIS, Circuit Judges, and LIVELY, Senior Circuit Judge.
 WELLFORD, Circuit Judge.
 
 
 1
 Anthony H. Lolli sued defendants Leonard F. Zaller, Edward Stinn, Jr., and Thomas V. O'Connell for violations of the securities laws of the United States, common law fraud, violation of fiduciary duties, and for RICO violations. These claims against these defendants and two corporations, allegedly controlled by two of the defendants, which corporations are no longer involved in this appeal, were based on the sale by the defendants of their interests in Ohio Premium Network, Inc. (OPN) and Midwest Teleproductions (Midwest), an Ohio partnership, following Mr. Lolli's disposition of his interests in OPN and Midwest to defendants Zaller and Stinn. In respect to the latter transaction, the defendants assumed liabilities of Lolli arising out of these businesses, particularly a substantial outstanding balance on a loan made to Lolli, Zaller, and Stinn by CIT Corporation. Lolli claimed that the defendants had acquired information about the value of a transponder[1] which OPN had previously acquired from RCA and about the status of an obligation Satellite Communications Network, Inc. (SCN), a corporation controlled by Benjamin Rabin, purportedly a satellite communications financier and adviser, owed OPN. The defendants allegedly concealed this information from Lolli, and Lolli charged that defendants deceitfully failed to advise him, as their fellow partner and corporate officer and director, about this material information bearing on the value of OPN and Midwest to his detriment and to the defendants' benefit. Lolli claimed that defendants Zaller and Stinn concealed this information from him with fraudulent intent, and that O'Connell had also acted in concert in what Lolli variously termed in his complaint, "fraudulent conduct," "untrue statements or omissions," "false and misleading representations," "fraudulent inducements, material omissions, failure to state necessary and material fact," "fraud and deceit," "scheme or artifice to defraud," and "violation of fiduciary duties."
 
 
 2
 The case proceeded to trial before a jury against the three individual defendants. The jury returned a verdict against all three defendants on the fraud claims, and against Zaller and Stinn for violation of fiduciary duties. There was a verdict for defendants on the securities law claims. The defendants appeal the jury verdicts on the common law claims. Plaintiff appeals from the refusal of the district court to allow interest on the unliquidated compensatory damages award.[2] We affirm the judgment as to Zaller and Stinn in part, and we reverse the judgment as to O'Connell.
 
 
 3
 There was a lengthy jury trial in this case, and defendants attack only one of the instructions given by the judge. We first consider this charge of error based on defendants' contention that it was error to instruct the jury on the question of a fiduciary duty owed by defendants as corporate shareholders, officers, and directors to another stockholder, Lolli, in this closely held Ohio corporation, OPN.
 
 
 4
 Plaintiff charged in Count IX of the amended complaint that defendants made misrepresentations to him "in connection with the sale of his interests in OPN and Midwest;" that they omitted "material facts necessary in order to make such statements not false and misleading," and that these actions "constituted a violation of fiduciary duties" under "principles of common law." The district court found for defendant O'Connell, concluding that there was "no evidence to support any breach of fiduciary obligation claim against Mr. O'Connell," who was charged with concealing material facts from him as a partner in Midwest or a stockholder-officer-director in OPN with respect to Lolli's sale of his interests therein. There is no appeal from this determination.
 
 
 5
 Defendants Zaller and Stinn first assert that Lolli failed to present sufficient evidence to the jury regarding any fiduciary duties that the defendants allegedly breached and that therefore no such instruction should have been given. Plaintiff requested such an instruction as to the fiduciary duty partners owe one another, and the district court gave instructions as to the corporate relationship between officers and/or directors and corporate shareholders.[3] There is no evidence that defendants specifically objected to this instruction,[4] so we will consider this assignment with respect to defendants' burden to demonstrate that the instruction was plain error and/or that it was directly prejudicial to defendants. We find no such showing made by defendants. See Radol v. Thomas, 772 F.2d 244 (6th Cir.1985), cert. denied, 477 U.S. 903 (1986). We find no demonstrated misstatement of the law and no error on the part of the court to instruct the jury on this point. We note that defendants had every opportunity to argue to the jury that plaintiff Lolli was an equal partner and had equivalent positions in the corporation to those occupied by Zaller and Stinn, and that Lolli had substantially equivalent knowledge and access to business information so that no special duty should exist under these circumstances. Indeed, we concede that the issue in this respect involves a close question in view of Lolli's longstanding position in OPN, his opportunity to find out pertinent information concerning the value of the corporation, and the testimony at trial, not substantially controverted by Lolli, that Lolli was always skeptical about any real value of the transponder rights to the corporation and generally its value, except as to a user. Lolli, for example, stated that neither Zaller nor Stinn ever refused to answer any question about financial affairs with him. Nonetheless, we reject defendant's assignment-of-error.
 
 
 6
 Next we consider defendants' assignment of error challenging the district court's granting of permission for plaintiff to call defendants' counsel to the stand to testify. This objection should be considered in relation to plaintiff's motion, prior to trial, to rescue Mr. Rosenberg, defendants' counsel. Plaintiff maintained the attorney had information about material facts in the controversy, but the trial court overruled this motion. Plaintiff called Rosenberg to the stand, and Rosenberg testified that he told Noah Mandell,[5] or Mandell's attorney, in the course of discussions about Midwest and/or OPN, that he no longer represented Lolli and that Lolli was not a part of the transaction pertaining to OPN and/or Midwest. He stated that on July 26, 1980, Lolli had transferred his interest in Midwest and OPN to Zaller and Stinn by agreement. Rosenberg conceded that on August 1, 1980, he had written a letter to Mr. Rabin of SCN stating that he had been retained by OPN, Midwest, and Lolli, Stinn, and Zaller. The August 1, 1980 letter advised Rabin that the parties he represented were declaring the 1979 agreement transferring an 80% interest in OPN and an option for control of Midwest to Rabin and to SCN void because of "material misrepresentations" by Rabin.
 
 
 7
 Rosenberg further testified that he later learned that Lolli "had relinquished his stock" in OPN to Zaller and Stinn pursuant to the July 26 agreement. His August 1 letter demanded the balance due on Rabin's agreement and threatened suit for rescission. He also stated that previously, on July 21, 1980, he had conversed with attorney Morse, who represented Noah Mandell, and that Morse had then furnished him the names of Stinn, Zaller, and Lolli as the interested parties in OPN. Rosenberg, by August 1, had only met Zaller a few days before; he had never met Stinn or Lolli.
 
 
 8
 A short time later when Rabin tendered Rosenberg the balance due on the 1979 agreement, Rosenberg rejected the payment and then sued Rabin and SNC. The August 1980 tendered payment was to Lolli, Zaller and Stinn. Rosenberg testified that he had no dealing with Lolli and did not contact Lolli about this. In a subsequent August 21, 1980 letter to Rabin or his attorney, Rosenberg again made reference to representing Zaller, Stinn, and Lolli, the latter he assertedly included by inadvertence.
 
 
 9
 In the suit filed in August 1980 by Rosenberg for OPN, Zaller, and Stinn against SCN and Rabin, Rosenberg claimed the value of the transponder to be in excess of $3,000,000. Rosenberg testified also that within two weeks after filing the aforementioned suit, he learned of Joe Checota as a potential purchaser of the transponder rights for several million dollars. The transaction was closed the following January for a total of $3,750,000 for the transponder rights; $750,000 of this amount was divided among Zaller, Stinn, and O'Connell. Rosenberg also acknowledged receipt of a letter from Morse in December 1980, advising that Mandell felt that Lolli "has been very badly treated" by defendants. Rosenberg also acknowledged that a November 1980 written assignment of interest from Zaller and Stinn to O'Connell was backdated to August 4, 1980, because Rosenberg was advised that it was in August that O'Connell succeeded to Lolli's interest, and would formally take on his share of the CIT indebtedness. Once again, this CIT assumption by O'Connell did not actually occur until November.
 
 
 10
 It is true that permitting examination of opposing counsel as a witness is unusual and is normally justified only by extraordinary circumstances.[6] The question here was whether Rosenberg was put on advance notice that he would be called upon to testify by the plaintiff and whether his personal testimony might have been avoided by the use of other witnesses, or by other means.[7] The district court, in denying plaintiff's pre-trial motion for recusal, had previously indicated that it may not be necessary to call Rosenberg to testify. The trial court, nevertheless, allowed the plaintiff to call Rosenberg to testify on the first day of trial. We are troubled by this procedure. Much of what Rosenberg testified about was available through testimony as depositions of other witnesses, or the plaintiff might have tendered exhibits with the opportunity for defendants to stipulate or to object to the effect thereof. Submission of deposition testimony of Rosenberg was an additional option which should have been explored. We are persuaded by the evidence and by the lack of pertinent authority submitted by the defendants that error, if any, in this respect was not shown to have resulted in denial of a fair trial; it was harmless error, if error at all.[8]
 
 
 11
 Defendants object also to the procedural handling by the district court of the reading of the deposition of Charles Morse, attorney for Mandell. The plaintiff offered this deposition testimony, which pertained to discussions at the purported July 25, 1980 meeting in Morse's office between Zaller, O'Connell, Morse, and Ken Silverman. Defendants maintained throughout trial that this meeting did not take place until August 26, 1980. It seems apparent that the jury did not believe Zaller with regard to the date of this meeting. The importance of the date is that defendants maintained that it took place a month after Lolli's agreement to dispose of his interests, whereas plaintiff claims that it happened the day before he was induced to relinquish his holdings in Midwest and OPN to Zaller and Stinn.
 
 
 12
 Defendants first objected to plaintiff's suggestion that he read only portions of Morse's direct examination as a part of plaintiff's proof. The court sustained defendants' objection and required plaintiff to read into evidence all the direct testimony of Morse except that part to which defendants had objected. The court ruled that the plaintiff was not required to read into the record the cross-examination of Morse.
 
 
 13
 Defendants did not elect to present any cross-examination of Morse as a part of their case. Plaintiff then moved to read small parts of Morse's cross-examination as rebuttal testimony. The district court permitted plaintiff to follow this procedure, and defendants claim that this caused them substantial prejudice. We disagree with this contention, and find that the district court did not abuse its discretion in the handling of this evidentiary matter at trial. We also perceive no real prejudice to defendant under the circumstances. No reversible error occurred in any event with respect to the evidentiary ruling or rulings by the district court.
 
 
 14
 The most serious issue raised by defendants in our view was their position at each stage of the trial that plaintiff had failed to prove any common law fraud.[9] The standard for a directed verdict (similar to that for a motion jnov) is that a court must view the total evidence in the light most favorable to the plaintiff, and then a court must decide whether reasonable minds viewing the evidence in that light could reach a decision for the adverse party. See Littlejohn v. Rose, 768 F.2d 765 (6th Cir.1985), cert. denied, Rose v. Littlejohn, 475 U.S. 1045 (1986); Patrick v. South Central Bell Tel. Co., 641 F.2d 1192 (6th Cir.1980); O'Neill v. Kiledjian, 511 F.2d 511 (6th Cir.1975); Reeves v. Power Tools, Inc., 474 F.2d 375 (6th Cir.1973). In reaching a decision on these issues, this court does not weigh the credibility of the witnesses, and we make reasonable inferences in favor of the non-moving party. Gillham v. Admiral Corp., 523 F.2d 102 (6th cir.1975), cert. denied, 424 U.S. 913 (1976).
 
 
 15
 There was ample evidence to support a jury verdict that the questioned meeting took place in July as maintained by plaintiff and not in August as asserted by defendants. There is also sufficient evidence to support Lolli's position that he reached no agreement to convey his interests until July 26, 1989, instead of July 12, as submitted by defendants.[10] The real question, however, is the content of the meeting--which we assume occurred July 25--whether Zaller and O'Connell (and Stinn who was not present) learned anything new, material, or significant at that meeting which they were required, or had a duty or legal compunction, to divulge to their fellow shareholder and director, Lolli.
 
 
 16
 Defendants contend that everything learned at their meeting with Morse related to the future and speculative value of transponder rights, and that representations, if any, made about such value could not, under Ohio law, legally constitute fraudulent misrepresentations. Defendants cite Ohio cases that indicate that a party must make an intentional and misleading misrepresentation, reasonably relied upon by the party to his detriment, or deliberately conceal a material fact, with respect to a present or past event or condition, in order to warrant a finding of common law fraud. Defendants contend that the evidence establishes no intentional false representation, and no deliberate concealment about a present or past material fact by them, or any of them, to plaintiff. They contend that any speculative information about the future value of transponder rights was already known by Lolli, and that a representation about future value is not actionable as fraud.
 
 
 17
 We consider it to be a very close question whether the subject matter of the meeting was the kind of vital and important matter or information that plaintiff claims it to be, even if one concludes that there is evidence that Zaller and Stinn deliberately concealed it from Lolli on July 26. It was on July 26 that a jury could reasonably conclude that Lolli decided, after consultation with the other two, to relinquish his partnership and corporate rights to them in exchange for their agreement to relieve him of existing personal indebtedness in relation to Midwest and OPN.
 
 
 18
 Morse, the attorney, presented as a witness for plaintiff, stated:
 
 
 19
 The purpose of the meeting was Noah Mandell had the objective to inform the people at Ohio Premium Network as to the current state of his relationship with Benjamin Rabin because he knew they had a relationship with Benjamin Rabin.... Mr. Mandell also knew there was financial defaults on the part of Satellite Communications Network in carrying out that contract.
 
 
 20
 * * *
 
 
 21
 * * *
 
 
 22
 So it was sort of an informational get together in which he intended to give them the status of our ongoing negotiations with SCN to resolve the matter short of litigation and our belief that we were headed towards litigation.
 
 
 23
 * * *
 
 
 24
 * * *
 
 
 25
 I think it was a case of they told us more information than we had about the contract and about the nonpayment, the failure to fulfill the terms of the contract [on the part of Rabin and SCN].
 
 
 26
 * * *
 
 
 27
 * * *
 
 
 28
 I'm not sure whether the other people had expressed it, but Mr. Mandell very definitely expressed it--the interest [in the transponder] was a very valuable asset.
 
 
 29
 Morse also testified that the value of the transponder rights was discussed and that Mandell "was of the opinion that transponder rights had enormous value."
 
 
 30
 It cannot be controverted that Zaller, Stinn, and Lolli had, without any contention about that agreement, sold 80% of their interest in OPN, which owned the transponder rights, for $50,000 to Rabin and/or SCN in August 1979, less than a year before the transaction here in controversy. This occurred despite Noah Mandell's opinion and predictions over a period of time made to all the parties that the transponder "was going to be very valuable for the user or the seller." Mandell testified that all the parties were "very skeptical" about this opinion of worth in the millions of dollars.
 
 
 31
 Mandell testified that there was some conversation about potential buyers and potential prices at the July 25, 1980 meeting but "nothing concrete" about the sale or value of the transponder. Once again, he was of the view that it was worth "millions." He also testified that Rabin had discussed with him and Zaller and Lolli that earth stations would be available for the transponder and he told them he would negotiate with Western Union to obtain additional transponder rights, which would be valuable. Mandell was not called to testify in person at the trial. Mandell also testified in his deposition that "Mr. Lolli consistently underestimated their value. He always thought they were unimportant, even the liability." He also testified that at some point Zaller had advised him not to discuss these matters with Lolli because the latter was no longer interested and/or was overwrought with family problems.[11]
 
 
 32
 Zaller's testimony was that the sale of the transponder rights was not discussed at the meeting at Morse's office, whenever it occurred, and that there was no specific discussion at the meeting about the specific value of those rights, although he conceded that "we always knew that the transponder rights had potential value," but that even in August 1980, he did not think them worth millions. Mr. Zaller indicated that his recollection about the meeting was somewhat vague and he presented no notes of that meeting, which had lasted some four hours.
 
 
 33
 O'Connell testified that when he and Zaller returned from the meeting, and he also thought it was in August, that they discussed the meeting with Stinn, and that it was decided that they were going to sue Rabin as was suggested by Morse and Mandell. He did not indicate whether there was any discussion about the value of transponder rights at the meeting. Ken Silverman, also present at the meeting, did not testify.
 
 
 34
 No one testified in any respect that there was any specific offer for Midwest and/or OPN interests, including the transponder rights, until some weeks, probably months, after Lolli had sold his interests.
 
 
 35
 We have examined the record in this case carefully, and we find there to be insufficient evidence of false statements or deliberate misrepresentations by any of the defendants to Lolli about the value of Midwest and/or OPN. There is evidence that defendants did not discuss with Lolli and did conceal from him information about what occurred at the assumed July 25 meeting. The fact that Mandell and his attorney, Morse, advised Zaller and O'Connell that they ought to sue Rabin and his corporation, SCN, because he was not carrying through with his obligation to them would, in our view, tend to indicate that the value of OPN was less, rather than enhanced, because this obligation due was of dubious value. Indeed, Lolli had every reason to know that SCN and/or Rabin had fallen behind on his committed payments on the $50,000 he agreed to pay for the parties' 80% interest. The only basis for Lolli's claim, then, is that defendants concealed, and had a duty to reveal, valuable and material information concerning the worth of OPN and Midwest which they received at the July 25, 1980 meeting. Everyone recognized, however, that Lolli had always been skeptical about the value of the transponder rights, and that he knew about or had access to all the other pertinent data about the assets and operations of Midwest and OPN. He was, in fact, the operating manager of both.
 
 
 36
 Under all these circumstances, we cannot find that punitive damages by reason of malicious, reckless, wanton, willful or gross acts of the defendants can be sustained. We therefore set aside the punitive damages award and find that the district court erred in not granting the motion for directed verdict, or for a judgment notwithstanding the verdict in this regard.
 
 
 37
 Giving the plaintiff the benefit of some considerable doubt with respect to the compensatory damages award, however, we sustain the compensatory award of $187,500 as to defendants Zaller and Stinn only.
 
 
 38
 Regarding the verdict against O'Connell for either punitive or compensatory damages on the fraud count, we find no evidence on which to base this finding because O'Connell had no occasion, as a minor figure in Midwest or OPN, to discuss with Lolli, or to be found guilty of withholding intentionally from Lolli important information about these entities or their value. O'Connell only learned about this information himself on July 25, 1980. He was not present at the July 26, 1980 meeting between Zaller, Stinn, and Lolli, and he was not a party to their agreement or to their discussions. Lolli was in a position superior to O'Connell to know about the transponder and about the operations of Midwest and OPN. We find, moreover, that the district court was correct in concluding that there was no evidence that O'Connell had breached any fiduciary obligation to Lolli. We, therefore, set aside as unwarranted and not based on the evidence the verdict against O'Connell.
 
 
 39
 Finally, we deal with the district court's denying Lolli's motion for prejudgment interest from July 5, 1982, when he filed suit. We find no error in the district court's finding that lolli had failed to meet his burden under Ohio Rev.Code Sec. 1343.03(C), which requires that the moving party show that defendants "failed to make a good faith effort to settle the case." The district court indicated rather that it was plaintiff's attorney who had failed to pursue a reasonable effort at settlement and that this failure persisted for more than five years. His demand, at the eve of trial, was for $250,000 plus prejudgment interest.
 
 
 40
 Whether "a party's settlement efforts indicate good faith is generally within the sound discretion of the trial court." Kalain v. Smith, 25 Ohio St.3d 157, 495 N.E.2d 572, 574 (Ohio 1986). An appellate court cannot disturb the trial court's findings of this issue unless there is an abuse of discretion. Kalain, 495 N.E.2d at 574. We find no error, therefore, in this action by the district court.
 
 
 41
 In sum, then, we set aside and REVERSE the judgment as to defendant O'Connell. We set aside and REVERSE the punitive damages award. We AFFIRM the compensatory damages award against defendants Zaller and Stinn. We also AFFIRM the denial of prejudgment interest.
 
 
 
 [1]
 A transponder is a channel on a communications satellite which picks up video and audio signals and reflects them back to earth
 
 
 [2]
 The jury returned a verdict for $187,500 in compensatory damages against the defendants, and the court ordered "each defendant to pay $62,500 of said sum." Plaintiff was awarded $75,000 in punitive damages and "each defendant ordered to pay $25,000 of said sum." (Emphasis added)
 
 
 [3]
 The district court held "there is no evidence that even if there was breach of fiduciary obligation among the partners, there was any resulting damages as far as the partnership fiduciary situation is concerned." We find no error in this regard
 
 
 [4]
 The objection was not based on any error of law but defendants' counsel's statement: "I don't understand that to be a claim in this case."
 
 
 [5]
 Mr. Mandell was a financial adviser to Midwest and to OPN, and also an attorney, and he was seeking to sell, or realize the value of, the transponder rights. He later was involved in litigation with the parties
 
 
 [6]
 See Gajewski v. United States, 321 F.2d 261, 268 (8th Cir.1963), cert. denied, 375 U.S. 968 (1964)
 
 
 [7]
 See United States v. Alu, 246 F.2d 29, 33 (2d Cir.1957); United States v. Torres, 503 F.2d 1120, 1126 (2d Cir.1974); United States v. Dupuy, 760 F.2d 1492, 1498 (9th Cir.1984) (standard is "compelling need")
 
 
 [8]
 Plaintiff listed Rosenberg as an intended witness on his prospective witness list filed with the court more than four months prior to trial. Rosenberg was a partner in a large firm, and in view of this question, another counsel from his firm might have been utilized, at least in part, at the trial. Rosenberg's notes and records were subpoenaed and listed as exhibits by plaintiff for trial purposes. Plaintiff asserts, without specific contradiction, that at the final pretrial he again made it clear that he intended to call Rosenberg as a witness. Finally, the record reflects no objection made by Rosenberg at the time he was called. Had he made such an objection, perhaps the problem may not have happened, or the result may have been different
 
 
 [9]
 This insistence was made by their motion for a directed verdict, by a motion for a judgment notwithstanding the verdict, and by a motion for a new trial, the latter based on a contention that the verdict was against the manifest weight of the evidence
 
 
 [10]
 The memorandum agreement about relinquishment of Lolli's interest in Midwest and OPN and signed by all parties, except O'Connell, was signed on July 26, 1980. It was drafted by Zaller and contained the following first paragraph:
 On Saturday, July 12, it was decided mutually that it is Tony Lolli's earnest desire to be relieved of any financial responsibilities having to do with personal guarantees on various notes used to purchase equipment for Midwest Teleproductions, and to also be relieved in any way or of any responsibility to act as a Partner in, or on behalf of Midwest Teleproductions, and OPN ownership and responsibilities.
 
 
 [11]
 Lolli conceded family problems, financial in nature, related to his concerns about seriously ill members of his family